## Mohler's Estate.

300

Argued October 8, 1941. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Clyde A. Armstrong,* of *Thorp, Bostwick, Reed & Armstrong,* with him *Lee W. Eckels* and *J. Roland Johnston,* for appellant.

*John C. Bane, Jr.,* with him *Seward H. French, Jr.,* and *Reed, Smith, Shaw & McClay,* for appellees.

OPINION BY MR. JUSTICE MAXEY, November 24, 1941:
This is an appeal from the action of the court below refusing an issue devisavit vel non and dismissing the appeal from the probate of the will of Mrs. India Mohler, a widow, who died November 28, 1939. The petition for a citation alleged that Mrs. Mohler when she made the will in question "was not of sound disposing mind, memory and understanding, but on the contrary was of unsound mind and incompetent to execute any paper requiring the exercise of discretion, mind, memory or understanding and that the execution was procured by contrivance and undue influence of Samuel C. McClay principal beneficiary named therein, and of others".

The will was dated August 7, 1939. It disposed of an estate of about $22,000. Mrs. Mohler left no children. The appellant is a nephew who was named as a bene-

ficiary under one of the decedent's several earlier wills. The residuary legatee under the challenged will was Samuel C. McClay, an officer of the Union Trust Company of Pittsburgh. The residuary estate amounted to approximately $18,000. Mr. McClay was the officer with whom she had practically all of her dealings with that Trust Company after it had been made guardian for her as a weak-minded person on January 31, 1939. He first met Mrs. Mohler at the St. Francis Hospital where she was kept as a mental patient from the early part of January 1939 until the 27th of the following March. She was released from the hospital at the latter date and went to live at the William Penn Hotel, Pittsburgh. This hotel was located "right across" from the Trust Company and Mrs. Mohler came to the Trust Company very frequently and conferred with Mr. McClay on matters pertaining to her estate. She asked Mr. McClay about a certain will of hers (not the will challenged) and asked him "if it was a good will". He replied: "I can't pass on that", but he did tell her it was in proper form. Later she talked to him "about writing a will". He referred her to her attorney, Robert W. Pratt. She replied that "she did not care to call Mr. Pratt." Mr. McClay then offered to give her a letter of introduction to a certain law firm, and she replied that "she didn't want it". Some time later she asked Mr. McClay: "Why can't I write a will myself?" He replied: "There is no law against that".

During the summer of 1939 she asked Mr. McClay for a form of bequest for the care of her grave and he complied with her request. She also asked if there was any objection to the Union Trust Company acting as executor and she said she would name that company as her executor. In the will in question she did so.

The decedent called on Mr. McClay on August 4, 1939, and learned that he would take his vacation, beginning Monday, August 7, 1939. He left Pittsburgh on this latter date and was absent two weeks. On August 7th Mrs.

Mohler visited the Union Trust Company and asked Mr. McClay's secretary, Miss Crane, where she could do some writing. Miss Crane allowed her to use Mr. McClay's desk and provided her with a pen. She sat at the desk about two hours, and asked Miss Crane how to spell certain words, such as "residue" and "bequest". Mrs. Mohler then asked Miss Crane to call Mr. Collingswood at the Union Savings Bank and see if he and Mr. Breitenbach were going to be in the bank for a time. This was ascertained to be the fact and Mrs. Mohler crossed the street to see these two men, who were officers in the bank named. Being assured by Miss Crane in answer to an inquiry that the Trust Department of the Union Trust Company would be open until 4:30, Mrs. Mohler left and upon her return before 4:30 she told Miss Crane that she had written a will and asked her to put it in a safe place. This was the will that was probated after its maker's death.

The subscribing witnesses to the will, Messrs. Breitenbach and Collingwood testified to Mrs. Mohler's asking them to witness her will. Mr. Breitenbach had known Mrs. Mohler for twenty years. In his judgment, he said Mrs. Mohler's mind was clear so that she knew what property she had when she made this will. Mr. Collingwood also knew Mrs. Mohler well. He testified to his belief in Mrs. Mohler's will when she made it and that she "knew exactly what she wanted him to do" when she requested him to witness the will.

Mr. McClay testified that he first knew of the provisions of the will when the will was opened and read after Mrs. Mohler's death. He declared that he did not know prior to that time that he was a legatee or beneficiary and that Mrs. Mohler never told him that she proposed to give him anything.

Appellant advances two propositions: First, "The alleged will is void as a matter of public policy". Second, "Proponent failed completely to meet the burden of proof imposed upon him". The argument in support of

the first proposition is "To permit McClay, whose sole relationship to the decedent was that of a fiduciary and confidential advisor, to become a chief beneficiary of her estate, would undermine public confidence in the administration of the estates of those unfortunates who have only the law to protect them against designing persons and their own incompetence. Certainly the law should not and does not permit any fiduciary to divert by any means the property of his ward to his own uses."

The answer to the statement in the last sentence just quoted is that there is no proof whatever that McClay "diverted" Mrs. Mohler's property to himself. She had an undoubted right to will any part of her property to him provided she was not "unduly influenced" to do so and provided she possessed testamentary capacity.

The contention that this court should declare Mrs. Mohler's will void as being against public policy must be rejected. The public policy of a state is established either (1) by the constitution and laws of the state or (2) by the judicial decisions of the courts of the state or (3) by general consent. General consent is usually manifested in numbers (1) or (2). For example, there is general consent that contracts entered into for the purpose of rewarding criminal acts or effectuating some illegal object are void and the courts strike such contracts down. A bequest for the purpose of financing the forcible overthrow of the government would likewise be proscribed both by general consent and by the courts. Ordinarily the decision as to whether any acts or contracts or bequests or any other private arrangements contravene the recognized interests of society rests on the determination whether they conflict with the expressions or clear implication of the state's organic law or its statutes or judicial decisions. In a case of first impression where there are no such guides, a judicial determination of the question becomes an expression of public policy provided it is so plainly right as to be supported by the general will. See *Mamlin v. Genoe et al.*,

340 Pa. 320, 325, 17 A. 2d 407. What is the "common law" of an organized community on matters affecting the public welfare quickly finds in modern times statutory or judicial expression or both.

There is no public policy condemning the receipt of a bequest by one who stood in a fiduciary relationship to the giver. Such a policy would impose an unwarranted restriction on the testamentary alienation of property and would prevent a testator from bestowing gifts on his closest friends and confidants, who often have stronger than kinsmen's claims on his bounty. The law wisely casts upon a legatee standing in a confidential relation to a testator the burden of proving that he used no undue influence to secure the legacy and this rule satisfies all the applicable requirements of "public policy".

Appellant's second proposition must also be rejected. In the instant case the record clears the legatee, McClay, of the imputation that he used undue influence on Mrs. Mohler. On this point the court below well said: "There is an absence of anything in the testimony to show Mrs. Mohler was cajoled, coerced or flattered by Mr. McClay. She was sick and needed kindly consideration, which seems to have been given her on her visits to the office of her guardian. In order to set aside a will, the influence must be such that the mind of the testator is controlled and dominated by another to the extent that the testator loses his own will and habitually submits to that of another. In this case there is no evidence of fraud, coercion or imprisonment of the body and mind of the testatrix so that her freedom of will were wholly under the influence and desire of another." As far as this record discloses, Mrs. Mohler's will resulted from her own independent judgment as to the proper objects of her bounty. She wrote the will herself and with no one present but herself. Mr. McClay was at that time (as above pointed out) away on his vacation. "To sustain allegation of undue influence, contestants must show

that testator's mind was under its control at the time and in the very act of making his will" : *Tetlow's Estate,* 269 Pa. 486, 487, 112 A. 758. See also *Geho's Estate,* 340 Pa. 412, 17 A. 2d 342. There is no proof whatsoever that Mr. McClay's conduct toward Mrs. Mohler was in any way improper or was craftily designed to influence her to act in the disposition of her property contrary to her own independent judgment. See *Phillips' Estate,* 244 Pa. 35, 90 A. 457.

As to Mrs. Mohler's alleged testamentary incapacity, the appellant relies chiefly (1) on the presumption of incapacity resulting from the adjudication on January 31, 1939, of Mrs. Mohler's being "so mentally defective that she is unable to care for her property and money" and (2) on the testimony of her attending physician, Dr. George J. Wright. She was under his care at St. Francis Hospital from January 7, 1939, to March 27, 1939. On the latter date she was discharged. After that date she reported at Dr. Wright's office "for check-ups and advice". Her last visit to his office was October 31, 1939.

The presumption on which the appellant relies simply means, as this court said in *Brennan's Estate,* 312 Pa. 335, 339, that "The effect of a prior adjudication of incompetency is to cast upon the proponents the burden of showing capacity at the time of making and executing the will: *Hoopes's Est.,* 174 Pa. 373". This burden the proponent of the will met to the satisfaction of the court below. That court declared that if an issue was awarded "a verdict against the validity of the will could not be allowed to stand". This court has often said that "in cases of this character, the findings of the chancellor supported by the court in banc must be considered just as binding on appellate courts as the verdict of a jury. Of course, if there is no evidence to support them or if it appears from the record that there is a capricious disbelief of evidence then the findings are worthless" : *Pusey's Estate,* 321 Pa. 248, 184 A. 844.

To sustain the burden resting upon the proponent he called several lay witnesses in addition to the subcsribing witnesses. A. L. Hoffman testified that he was a furrier, that he had many dealings with Mrs. Mohler in reference to fur coats in 1939. He said she had the mental capacity to do business intelligently. F. A. McNellis testified that he was assistant manager of the William Penn Hotel and that he leased a room to Mrs. Mohler in 1939. While she was living at the hotel she called to his attention errors in her account. He said he noticed nothing unusual about her. He added "there was nothing different in her and any other women we have in the hotel." Miss Young, the manager of the grille in the William Penn Hotel, saw Mrs. Mohler in the dining room daily when she lived in that hotel and conversed with her often. She testified that Mrs. Mohler "was an intelligent person". Miss Farmer, the hostess in the William Penn grille, often talked with Mrs. Mohler. She testified: "She was perfectly sane as far as I could figure out." F. M. Cox, credit manager of the William Penn Hotel, saw Mrs. Mohler almost daily when she resided at the hotel between March 26, 1939, and November 27 of the same year. He said: "She was normal as far as my discussions with her were concerned." Mrs. Graham, the executive housekeeper at the William Penn Hotel, knew Mrs. Mohler as a guest of the hotel and called on her seven or eight times. She testified: "She seemed perfectly all right to me." Mrs. Wright, a maid at the hotel, gave similar testimony.

The appellant's chief witness was Dr. Wright (supra), who described Mrs. Mohler's physical and mental ills and her "most bitter feelings" toward those who had her committed to St. Francis Hospital and others. When asked his opinion of her "mental capacity to formulate the will of August 7th" he replied: "I think she could have written it, I mean as far as the actual matter of handwriting is concerned, but I can't help but think she must have had a form or something to help or guide her,

to hold her to the very direct and brief statements that she has made here." After testifying on cross-examination that he did "not think she had testamentary capacity at any time during the period" he was treating her, he was asked: "What you have chiefly in mind was she harbored what you took to be unjust prejudices against others?" He replied: "That is right", and declared that fact to be his "principal reason for doubting her testamentary capacity."

There is no rule requiring a tribunal to surrender its judgment to an expert's opinion. The weight to be given such an opinion is for him or them on whom the responsibility of decision rests. No witness' expression of opinion restricts the tribunal's exercise of judgment. When Dr. Wright declared that his "principal reason" for doubting Mrs. Mohler's testamentary capacity was her "unjust prejudices against others", he thereby impaired his opinion's probative value. The persuasive power of a conclusion is proportionate to the cogency of the reasoning by which it is supported. An individual's "unjust prejudices" against others have no relation to his testamentary capacity and an opinion based "principally" upon the converse assumption is entitled to little weight. Furthermore, Dr. Wright admitted that Mrs. Mohler's mind "had improved very greatly after January 7th and also after January 31, 1939." He said that before she left the hospital in March 1939 she "improved so much that she was able to function physically and mentally with clearness of mind regarding her environment, people, places, time". He added: "but at no time that she was under my care did I find her free from prejudice, extreme irritability and unreasonableness about ordinary things, and, worst of all, she never had any insight or understanding regarding the nature of her illness or of her mental breakdown. In spite of the fact that she had had these two admissions to the St. Francis Hospital, she would never admit that there was anything wrong with her; she felt that she had been sent

there without just reason, and she blamed everybody that had anything to do with it, except myself." As to Mrs. Mohler's prejudices the court below appropriately said: "She was indignant over the appointment of the guardian. . . . However, she was entitled to her likes and dislikes, her preferences and prejudices, and even when overdrawn or in error this attitude does not justify the conclusion she was unable intelligently and capably to make her will".

Appellant cites *Appeal of George Murdy et al.,* 123 Pa. 464, and says "There are many facts and circumstances [in that case] analogous to those involved here". The fact found by the court below in that case and declared by this court to have been "found correctly" that the testatrix was "a lunatic without lucid intervals", sufficiently distinguishes that case from this so as to make its citation inapposite.

*Schwartz's Est.,* 340 Pa. 170, 16 A. 2d 374, also cited by appellant, differs from the instant case in that the court below found on sufficient evidence that the testatrix, an invalid who was physically infirm and mentally impaired, had been unduly influenced by her nurse who had been her personal attendant and confidential adviser for six years to make a will bequeathing to her $95,000 of an estate valued at $100,000. Since the evidence supported this finding we held the latter to be "binding on this court".

What we said in *Wetzel v. Edwards,* 340 Pa. 121, 16 A. 2d 441, applies with equal force to the case now before us: " 'No right of a citizen is more valued than the power to dispose of his property by will. . . . His . . . last and final direction should not be struck down except for the clearest reason.' The not unusual disappointment of heirs at law, with the provisions of a testator's will, and evidence of certain infirmities of a testator which are not uncommon incidents of advancing years, constitute no reason for giving a jury the right to set aside a will made by a testator who apparently knew what he

was doing and acted on his own judgment." This court has in a long line of cases recognized "the unquestioned right which everyone master of himself has to give his property to whom he pleases": *Kustus v. Hager et al.,* 269 Pa. 103, 111, 112 A. 45.

The decree is affirmed at appellant's cost.