## Kline Estate

*Emanuel Goldberg*, for appellants.

*Mahady & Mahady*, for appellees.

COPELAND, P. J., September 28, 1954.—Decedent, Benn Kline, died a resident of this county, on September 6, 1952. His last will, dated November 7, 1951, was probated on September 8, 1952, and letters testamentary were issued to two of decedent's sons, Louis and Jacob Kline.

An appeal from probate of the will was filed on September 3, 1953, by decedent's two daughters, Dora Etta Tanner and Hannah H. Mehlman. On October 8, 1953, preliminary objections to the petition for citation, accompanying the appeal, were filed and on November 16, 1953, a petition was filed by contestants for leave to amend the petition on the appeal. This paper has been and is now considered as an amendment to that petition. An answer was filed by proponents

on January 11, 1954, and hearings were heard before the court on March 23 and 24, 1954.

The reasons assigned by contestants in their appeal are lack of testamentary capacity and undue influence.

### Findings of Fact

1. Decedent herein, Benn Kline, died testate, on September 6, 1952, a resident of this county, and his last will dated November 7, 1951, was duly probated on September 8, 1952, and letters testamentary were issued to Louis and Jacob Kline.

2. Decedent's wife predeceased him and he left to survive him as his heirs at law six children, being four sons, Harry, Louis, Jacob, Joseph, and two daughters, Hannah Mehlman and Dora Etta Tanner. All these children are sui juris and their ages range from 32 to 47 years.

3. By his last will testator disinherited Hannah; he gave Joseph $1,000, and created three trusts of $5,000 each for the children of Harry, Louis and Dora Etta; he also created a trust of a house and lot on Weldon Street, appraised at $8,500, for Dora Etta during her life and at her death to her children; and gave the residuary estate to Louis, Jacob and Harry. This will also contained a provision whereby any of the four sons was given the right to purchase an equity in the store business in which decedent had been a partner with his son, Harry.

4. Decedent had executed a prior will on May 26, 1949. In this will decedent also disinherited Hannah; set up a trust of $5,000 for Dora Etta for life and then to her children, and gave the residue of his estate to the four sons. This will also contained a provision for any of the four sons to purchase an interest in decedent's business.

5. Decedent executed the next prior will in June 1948. By this will, he also disinherited Hannah, and gave the residue of his estate to the five other children.

This will also provided for any of the sons to purchase an interest in decedent's business.

6. Decedent had certain prejudices against some of his children. He was prejudiced against Hannah chiefly because of difficulties arising out of the settlement of the estate of decedent's wife and which resulted in Hannah entering a suit against her father. With respect to Dora Etta, he had a friendly feeling toward her but did not get along with her husband and did not want him to receive any of the estate. With respect to Joseph, decedent thought that he was wasting his time as a veterinarian and wanted him to take a part in decedent's store business, which Joseph failed to do.

7. Decedent undoubtedly had testamentary capacity and was of sound mind. After the date of the will decedent transacted business in handling the store business during Harry's vacations and during Harry's lunch hour every day. He bought property in Latrobe Borough and managed his rented properties, arranging for repairs and personally collecting rent. He acted together with Harry in the purchase of merchandise for the store. Decedent was a very good business man up until several days before his death and was of a very determined nature.

8. The only evidence presented by contestants as to testamentary capacity was that decedent had a violent temper at times, was forgetful as to where he had put certain articles and that he had somewhat slowed down since the death of his wife in October 1947.

9. The health of decedent, at the time of writing his last will, was apparently good. In 1951 he drove his car, by himself, to Hot Springs, Ark., and in the summer of 1952 he drove by himself to visit his son in California. He did business in the store until the time of his death.

10. Two of decedent's sons, Harry and Louis, held much the same prejudicial views against Hannah and

the husband of Dora Etta. They discussed these matters with decedent, but in agreement with him rather than in way of influencing him.

11. There was no undue influence practiced upon decedent at any time which influenced him at the time of writing his last will.

### Conclusions of Law

1. Decedent was of sound mind and had testamentary capacity at the time of the execution of the will dated November 7, 1951.

2. There was no undue influence practiced upon decedent which affected him at the time of the execution of the will.

3. The appeal from probate of decedent's will should be dismissed and the decree of probate confirmed.

4. The costs should be paid by contestants.

### Discussion

When proponents offered in evidence the record of the probate of decedent's will, the burden of proof shifted to contestants to prove lack of testamentary capacity (Higbee Will, 365 Pa. 381), and to prove undue influence: De Maio Will, 363 Pa. 559.

All the evidence, including that of contestants, shows without a doubt that testator had testamentary capacity. There is no inference in the evidence that testator was seized of any sudden mental disability at or near the time of the execution of the will. Decedent did have a slight stroke in 1948, as a result of which he temporarily lost the use of his right arm and the sight of his right eye. However, testator's recovery was substantially complete, although he suffered from high blood pressure. Decedent drove his own car, unaccompanied by anyone else, from Ligonier to Hot Springs, Ark., in 1951, and made a similar trip to California in the summer of 1952. After the date of

the will decedent purchased real estate in Latrobe, attended to maintenance of other rented property, personally collected rents therefrom, transacted business in the usual manner in his store in Ligonier, was at times vice president or treasurer of a club to which he belonged, and generally did all the things he was accustomed to do at a time when there was no doubt about his testamentary capacity, although he did not act as strenuously as he had in prior years.

The only evidence presented by contestants as to mental capacity was that testator at times had a violent temper, was forgetful where he had placed things, complained of headaches, and had slowed down to some extent. Of these things, only forgetfulness would have some bearing on this case, and a failure of memory is not incapacity unless it is total or extends to the immediate family or to his property: Conway Will, 366 Pa. 641.

As set forth in the findings of fact, testator had certain prejudices against some of his family. In Mohler's Estate, 343 Pa. 299, and speaking about testatrix in that case, the court said, page 308:

" 'However, she was entitled to her likes and dislikes, her preferences and prejudices, and even when overdrawn or in error this attitude does not justify the conclusion she was unable intelligently and capably to make her will' ".

There is nothing in the way of undue influence shown in this case:

" 'In order to constitute undue influence sufficient to void a will, there must. be imprisonment of the body or mind, . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will' ": Olshefski's Estate, 337 Pa. 420, 424.

In order to be successful in this case, contestants would have to show that testator was under such undue influence in the very act of making the will (Geho's Estate, 340 Pa. 412), and where, as in this case, there is a strong mind and determined nature, "nothing short of direct, clear and convincing proof of fraud or coercion will avail": Cressman's Estate, 346 Pa. 400, 405.

In view of the fact that testator's will was written after 8 to 12 conferences with his attorneys and follows the same pattern as two prior wills, the existence of undue influence is made extremely unlikely. The two attorneys who assisted in the preparation of the will and were subscribing witnesses, gave convincing evidence that decedent knew what he wanted to do and that he appeared for all conferences unaccompanied by any other persons. Any persuasion directed by decedent's sons which might have influenced testator was legitimate in the sense that testator might have been coaxed rather than forced: Brennan's Estate, 312 Pa. 335; Kish v. Bakaysa et al., 330 Pa. 533 and Olshefski's Estate, supra. It is only when persuasion overcomes testator's judgment through moral coercion or force that it becomes undue influence: Robinson v. Robinson, 203 Pa. 400. There is nothing of this kind in this case.

### Decree

And now, September 28, 1954, after hearing and argument, it is ordered, adjudged and decreed that the appeal from the probate of the last will and testament, dated November 7, 1951, of Benn Kline, deceased, is dismissed and the decree of probate is confirmed. Costs of this proceeding to be paid by contestants.