## Gorsuch Estate (No. 2)

Before Klein, P. J., Bolger, Hunter, Lefever, Saylor and Shoyer, JJ.

*George F. Shinehouse, Jr.,* for proponents.

*James F. Masterson* and *Vincent P. Froio,* for exceptants.

LEFEVER, J., March 8, 1957.—We have carefully examined and considered the well drawn will and codicil

of testatrix, with its gifts to her niece, Mrs. Payne; to the latter's children, to several relatives by marriage, to others whom she treated as relatives, to 15 friends, to 14 hospitals, homes and churches and the large educational trust; the voluminous record compiled in this case during 18 days of trial, the able and exhaustive briefs of counsel and the masterful and comprehensive opinion of the learned hearing judge.

There is no doubt that testatrix at times was eccentric, opinionated, petty, mean, suspicious, contentious, distrustful, conceited, garrulous, domineering and boring. She continually complained about her lawyers and brokers, unfairly charged an elevator operator with theft, denounced those who offended her, quarreled with tenants of her real estate and unwarrantedly disagreed with her advisors and anyone who differed with her. She suffered from myzedema, arthritis, cystitis and arterioscleroris. On occasion, her memory was somewhat deficient, owing to arteriosclerosis and normal forgetfulness of a woman 77 years of age. However, although she was frugal, even miserly, in satisfying her own personal wants, she was generous to charities, friends and others during her lifetime. She was very active physically until the day of her death. She walked with a brisk step. She drove her automobile. She traveled alone by train to Florida and back to Philadelphia within a few months of her death. She did her own shopping and housework. She spoke clearly in a well-modulated voice. She wrote with a firm, bold, clear hand and distinctive signature. She penned lucid, logical, easily understood letters, as late as April 10, 1954. She kept a social engagement on April 15, 1954, the day she died. She was positive, independent and self-reliant to the end.

The parade of bankers, lawyers, doctors, real estate men and others, called to the witness stand by the contestants, testified to testatrix' peculiarities and idio-

syncracies. However, almost without exception, they agreed that testatrix possessed the three fundamental requisites for testamentary capacity, namely: (1) She knew precisely who were her relatives by blood and by marriage; (2) she knew the extent of her property and, in fact, kept meticulous records with regard to her substantial estate for a period of 15 years prior to her death, and (3) she was fully conscious of the natural objects of her bounty, viz., her relatives by blood and by marriage, her friends, and her favorite charities. Dr. Sara Maiden, her personal physician and friend for many years, conceded her capacity on these points. Proponents' witnesses corroborated the contestants' witnesses on these important essentials. The only contradictory testimony was that of Dr. A. M. Ornsteen and Dr. Joseph Yaskin. The eminence of both of these physicians in their fields of neurology and psychiatry is undisputed. Dr. Ornsteen has, and Dr. Yaskin during his lifetime had, the respect and confidence of this court. However, neither doctor ever saw the decedent and testified solely in response to long hypothetical questions slanted to the contestants' position, which did not state many of the important, relevant facts, facts upon which the court reaches its conclusion in this case. Such opinion testimony by experts is to be given little weight by the court in the face of testimony by witnesses who saw testatrix and knew her intimately. See Mohler's Estate, 343 Pa. 299.

This will was prepared with unusual care. A series of drafts was made. Testatrix and the three scriveners had several conferences regarding the will at which testatrix freely expressed her views and debated with the scriveners as to the wisdom of changes suggested by them for legal reasons. A preliminary draft of the will of November 23, 1953 (which was substantially the same as the final will of December 28, 1953), was read aloud in turn by one of the scriveners and testa-

trix, and vigorously discussed paragraph by para-
graph. Likewise, the final drafts of the will of Novem-
ber 23, 1953, the will of December 28, 1953, and the
codicil of January 4, 1954, were read aloud and thor-
oughly discussed before testatrix executed them. Tes-
tatrix initialed each handwritten change and each
page of both wills and the codicil. The execution of the
wills and codicil was witnessed by the scriveners and
one of their secretaries. In the unequivocal opinion of
all of them, testatrix was of sound and disposing
mind.

A will prepared by a member of the bar, having no
personal interest in the matter, has unusual sanctity.
This is more so when the final draft of the will has
been preceded by preliminary drafts thereof and con-
ferences between counsel and testatrix.

Testatrix had an unusual amount of experience with
wills. At least 10 wills were prepared for her during
the 15 years preceding her death. It is clear that testa-
trix knew what she wanted in her last will, and that
the will of December 28, 1953, and the codicil of Jan-
uary 4, 1954, carried out her wishes.

Patently, testatrix had testamentary capacity with-
in the well established principles of Pennsylvania law.
It is equally clear that no undue influence, within the
legal concept of that term, was exercised upon testa-
trix by the scriveners or by any of the beneficiaries.

There is no doubt that testatrix' niece, Mrs. Payne,
has standing before the court inasmuch as testatrix
made provision for her in prior wills. However, there
is no evidence that any of the other contestants were
ever included in any of the 10 wills executed by testa-
trix prior to her death. This is normal in light of the
evidence that testatrix had not seen them for upwards
of 10 years and that there was no friendship nor social
communication between testatrix and these contes-

tants. It is questionable, therefore, whether the contestants, other than Mrs. Payne, are properly in court in this controversy. Moreover, it is noteworthy that the court, in judging the testamentary capacity of testatrix, can take into consideration the fact that the will at issue follows the general pattern of earlier wills: Frazier Estate, 75 D. & C. 577. In general, this would seem to be the fact in the instant case. Finally, the will in this case is a natural will, with the added sanctity to which such a will is entitled.

Testatrix did not manifest the intent or perform the act necessary to revoke the will of December 28, 1953, and/or the codicil of January 4, 1954. The evidence is strong that until the date of her death she considered these documents to be her will and codicil and to be in full force and effect. Moreover, there is no evidence that testatrix intended to die intestate and thereby benefit those of the contestants whom she had not seen, nor been friendly with, for upwards of 10 years. Kehr Will, 373 Pa. 473, is unique and sui generis. The doctrine therein laid down is not to be extended beyond the exact facts of that case. The statement in testatrix' handwriting on the envelope in the instant case: "I never signed these legal papers as for my last will" was true, because the enclosure was only a conformed copy of her will. Moreover, this statement does not evidence any "animo revocandi".

The learned hearing judge has carefully and ably analyzed the testimony in this enormous record and has fully discussed the legal principles involved. There is no need to repeat what he has done so meticulously and exhaustively. Therefore, for the reasons stated by him and those contained herein, we are of the opinion that the learned hearing judge correctly refused to grant an issue devisavit vel non.

Accordingly, the exceptions are dismissed.