## Capers Estate

*Houston & Houston*, for petitioners.

*John D. Stedeford*, for residuary legatee.

*John M. Haverty, Jr.*, *William Howard Colbert*, Special Assistant Attorney General, and *Walter E. Alessandroni*, Attorney General, for Commonwealth.

RAHAUSER, J., November 12, 1964.—Ida M. Capers, the owner of two Irish setters named "Brickland" and "Sunny Birch", died January 27, 1963. Her will provided, among other things:

"FIFTH: I direct that any dog which I may own at the time of my death be destroyed in a humane manner and I give and grant unto my Executors hereinafter named full and complete power and discretion necessary to carry out the same."

The executors of the estate filed a petition for declaratory judgment, February 28, 1963. At that time, the court directed that the hearing on the declaratory judgment would be held at the time of the audit. At the audit of the estate a date was set for the disposition of the prayer of petitioners.

The petition prays that the court determine the rights and duties of the executors by reason of the aforementioned clause in the will of the above decedent.

A hearing was held September 15, 1964, at which time all parties in interest were given an opportunity to state for the record their respective positions. The testimony and the submitted briefs have been considered.

The tradition of this court is to consider with care all matters that come before it, whether they concern the disposition of animals of small value or estates of vast resources.

One of the pertinent matters that came to the court's attention was an address of the late Senator George G. Vest, of Missouri, when he was a young lawyer. He became involved in a lawsuit where his client was suing a neighbor for killing a pet dog. Many of the things that Senator Vest said in his address to the jury are applicable here and, because they are so well stated, they will be made a part of this opinion, having some bearing on the matter before the court. His memorable words are as follows:

"The best friend a man has in the world may turn against him and become his enemy. His son or daughter that he has reared with loving care may prove un-

grateful. Those who are nearest and dearest to us, those whom we trust with our happiness and good name, may become traitors to their faith.

"The money that a man has he may lose. It flies away from him, perhaps when he needs it most. A man's reputation may be sacrificed in a moment of ill-considered action.

"The people who are prone to fall on their knees to do us honor when success is with us may be the first to throw the stone of malice when failure settles its cloud upon our heads.

"The one absolutely unselfish friend that a man can have in this selfish world, the one that never deserts him, the one that never proves ungrateful or treacherous, is his dog.

"Gentlemen of the jury, a man's dog stands by him, in prosperity and poverty, in health and sickness. He will sleep on the cold ground, where the wintry wind blows and the snow drives fiercely if only he may be near his master's side. He will kiss the hand that has no food to offer; he will lick the wounds and sores that come in encounter with the roughness of the world. He guards the sleep of his pauper master as if he were a prince.

"When all other friends desert, he remains. When riches take wing and reputation falls to pieces, he is as constant in his love as the sun in its journey through the heavens.

"If fortune drives his master forth an outcast in the world, friendless and homeless, the faithful dog asks no higher privilege than that of accompanying him to guard against danger, to fight his enemies, and when the last scene of all comes and death takes the master in its embrace and his body is laid away, there by his graveside will the noble dog be found, his head between his paws, his eyes sad but open in alert watchfulness, faithful and true even unto death."

The will of decedent provided that the executors of her estate should follow a prescribed course of action in dealing with her Irish setters. There was uncertainty on the part of the executors, if they should take such drastic action without the authority of the court. The governor of the State ordered the Attorney General of Pennsylvania to intervene to prohibit the executors from carrying out the illegal purpose of the will.

This court has jurisdiction to consider the petition of the executors. William G. Hawkins, Jr., in his book, "Orphans' Court Principles and Practice in Pennsylvania," 1914 ed., p. 4, stated the purpose of this court as follows:

"The purpose of the establishment of Orphans' Court is supervision and control of the administration, and distribution among parties interested, of the estates of decedents. All personal property of which the owner dies possessed constructively passes into the grasp of the law, responsibility for its official custody begins; the rights of creditors, legatees, and next of kin, therein become fixed; and, from necessity, the jurisdiction of these Courts attaches as of the date of death, and the Courts may, in the exercise of this jurisdiction do thereafter whatever may be essential to the protection, and recovery, of such assets in the course of their administration and distribution."

The Uniform Declaratory Judgment Act, 12 PS §834, provides this proceeding may be used "To direct the executors, . . . to do or abstain from doing any particular act in their fiduciary capacity;" and 12 PS §836, provides that:

"Relief by declaratory judgment . . . may be granted in all civil cases where an actual controversy exists between contending parties, . . . and the court is satisfied also that a declaratory judgment or decree will serve to terminate the uncertainty or controversy giving rise to the proceeding. . . ."

The executors properly filed this petition for declaratory judgment. Had they carried out the provisions of decedent's will, they would have followed an inhumane course of action from which there is no appeal and would have established a precedent that this court believes is not in accord with the law.

The court has studied the petition and the testimony given at the hearing and concludes that the questions involved are:

1. Was the petition for declaratory judgment proper?

2. What was the purpose and intent of testatrix?

3. Is it against public policy to hold valid a clause in a will directing the summary destruction of decedent's property after death?

4. Does the Wills Act authorize a decedent to direct the summary destruction of her property?

5. What is the present status of the two Irish setters mentioned in decedent's will?

6. What should the executors do under the present circumstances with the two Irish setters mentioned in the will of the decedent?

7. Does the prayer of the petition require the court to pass on the propriety of the executors' duties as to an appeal from the ruling of the court?

The petition is properly before the court and must be disposed of.

In the analysis of the petition, after first determining that the court has jurisdiction, the court must then determine what was the intent of testatrix as evidenced from the four corners of the will.

Let us consider the second question, which deals with the intent of testatrix.

It is apparent that testatrix was deeply interested in the humane care and treatment of animals. She left the greater part of her fortune for these purposes.

The testimony at the hearing indicated that the chief objects of decedent's affection were the two Irish setters mentioned in her will.

She was interested that they would be given the same care after her death that she gave them while she lived. She evidently feared that either they would grieve for her or that no one would afford them the same affection and kindness that they received during her life.

She, accordingly, made the above provision in her will for their destruction.

Testimony indicates that she was mistaken on both above points.

The record is clear on this fact.

Dr. John P. Childress, a veterinarian who was known to Miss Capers and whom she employed during her life testified to the degree of care Miss Capers gave the two Irish setters and to the affection that she exhibited in her attention to them.

He testified as follows:

"Q Dr. Childress, you know this hearing concerns two Irish setters, formerly the property of Miss Ida M. Capers, Deceased?

"A Yes.

"Q Are you familiar with these dogs?

"A Yes, I took care of the dogs when Miss Capers was living.

"Q Did you take care of them before they were placed in the Kennels?

"A Yes.

"Q You had direct contact with Miss Capers?

"A Yes.

"Q Doctor, can you describe the age and state of health of these dogs?

"A Yes. As far as the state of health is concerned the dogs are in very, very good physical condition. When they were in the care of Miss Capers, nothing

was undone to provide everything in the world for the dogs; and I am very pleased to say that since they have been in the Kennel, where they are at the present time, this has remained the policy. The dogs have had very good care, and are in good physical condition.

"Q Doctor Childress, according to the American Kennel Club Registration for the two dogs: Brickland was born on July 27, 1956, and Sunnybur (sic) on February 8, 1960, what would you say is the life expectancy of the dogs, as of the present time?

"A In general I would say that rather large dogs, such as Irish Setters, would live with the care that these dogs have had, to be from 14 to 16 years old, perhaps more; but that I would say would be the expectancy in general. You are speaking in terms of statistics, and when you come down to individual cases, there is quite a variation.

"Q A moment ago you said you took care of the dogs while Miss Capers was living, as well as subsequent to the time of her death. Can you describe the care that Miss Capers gave them?

"A Well, all I can say is that Miss Capers lived on Fifth Avenue and I live in Wexford, and she would hire a taxicab to bring the dogs all the way over to my office; or she would have me come all the way over to her home, if the dogs required any medical attention. This was because she felt that for some reason, I would give the dogs better services, than perhaps someone else might. But there were many qualified veterinarians who had been closer to her than I, to provide services, but this did not matter: Her home was for her dogs. She had Kennel facilities. The car was for the dogs, when she had a car. She had a separate area in the basement of her home, for grooming, bathing and taking care of these two dogs. They were her entire reason for her existence, I would think. I spent many hours reassuring her, whenever she was upset over

something that had gone wrong with either Sunnybur or Brickland.

"Q Did she ever discuss with you, or express her concern, of what would happen to the dogs following her death?

"A No. I don't think she was contemplating passing away; and I daresay the only way she cared for the dogs—her biggest concern would be, if she passed away, that they would not be cared for; and I am familiar with the provisions in Miss Capers' Will; and I feel, knowing her and the care that she had given the dogs and how dear they were to her, would be the concern that they would not receive the same type of care; and I am sure,—this is of course conjectural on my part—but I am sure this was the main reason for the item in her Will.

"Q In the course of your practice, have you been called upon to destroy a dog?

"A Yes.

"THE COURT: We are not going into that. We are not going to make a large record here. Exception noted.

"MR. HOUSTON: Cross-examine.

*"Cross-Examination*

"MR. COLBERT:

"Q Have you had occasion to attend to dogs under the care of Mr. and Mrs. Miller?

"A Yes, I have.

"Q Would you tell us of the maintenance facilities of Mr. and Mrs. Miller?

"A Yes. One time when Mr. and Mrs. Miller were out of town, they left word with other relatives who were staying at the Home caring for their own dogs, that if anything should happen to either of the dogs, I should be called; and one of the dogs developed an ear infection, and I called. When I got to the place, the two Irish Setters were in the Home, as I would be if I were a member of their family. There were rugs for the

dogs to lie on. There were other dogs besides Sunny-bur (sic) and Brickland, and they were all together, quite content and very, very happy.

"Q Are Irish Setters the type of dog that would like to run?

"A I would say that this is an individual trait rather than a breed trait. All dogs would require exercise. Larger dogs, perhaps, need a little more space to run.

"Q Has there been adequate space where Mr. and Mrs. Miller is, for dogs to run?

"A Absolutely. They have a farm type house out in the country, with adequate facilities for exercise.

"Q On a comparative basis, are the dogs healthier; or is there much of a change in the dogs? Are they happy?

"A I would say that the dogs are even happier in the present situation than they were with Miss Capers. Miss Capers lived inside, and everything was done for them. However, she lived on Fifth Avenue, and the dogs had to be walked on a leash, and Miss Capers could not do this at all times and she would have to hire someone to walk the dogs for her.

"Q Is it my understanding that the dogs are permitted to run?

"A Permitted to run under supervision.

"Q When was the last time that you saw the dogs?

"A The last time that I saw the dogs was on August 7th of this year.

"Q That's all. No further questions."

The testimony clearly shows that the basis for the provision of the will has been eliminated. There is no lack of care. There is no reason for carrying out the literal provision of the will. That decedent would rather see her pets happy and healthy and alive than destroyed, there can be no doubt.

Other testimony confirms what this witness suggests and what the court concludes. We, therefore, believe

that the intent of testatrix would be carried out if her two favored Irish setters were placed where they are given the same care and attention that she bestowed on them; where they are doubtlessly as happy and contented as they were during the life of their owner.

This brings us to the third question. Is it against public policy to hold valid a clause in a will directing the summary destruction of certain of decedent's property after her death?

There is no question of the strength of the public sentiment in favor of preserving the lives of these animals. This is in accord with the upward development of the humane instinct in mankind for the preservation of life of all kinds, not only of human life but of the life of the lesser species. Man has come to realize that he has an ethical duty to preserve all life, human or not, unless the destruction of such other life is an absolute necessity. This ethic is epitomized in Albert Schweitzer's phrase "reverence for life" and is best expressed by that noble man in his book "Out of My Life and Thought," at pages 125-126 of the 1936 Holt edition. This statement is as follows:

"What is Reverence for Life, and how does it arise in us?

"If man wishes to reach clear notions about himself and his relation to the world, he must ever again and again be looking away from the manifold, which is the product of his thought and knowledge, and reflect upon the first, the most immediate, and the continually given fact of his own consciousness. Only if he starts from this given fact can he achieve a rational view. . . .

"The great fault of all ethics hitherto has been that they believed themselves to have to deal only with the relations of man to man. In reality, however, the question is what is his attitude to the world and all life that comes within his reach. A man is ethical only when life, as such, is sacred to him, that of plants and ani-

mals as that of his fellow men, and when he devotes himself helpfully to all life that is in need of help. Only the universal ethic of the feeling of responsibility in an ever-widening sphere for all that lives—only that ethic can be founded in thought. The ethic of the relation of man to man is not something apart by itself; it is only a particular relation which results from the universal one.

"The ethic of Reverence for Life, therefore, comprehends within itself everything that can be described as love, devotion, and sympathy whether in suffering, joy, or effort.

"The world, however, offers us the horrible drama of Will-to-Live divided against itself. One existence holds its own at the cost of another; one destroys another. Only in the thinking man has the Will-to-Live become conscious of other will-to-live, and desirous of solidarity with it. This solidarity, however, he cannot completely bring about, because man is subject to the puzzling and horrible law of being obliged to live at the cost of another life, and to incur again and again the guilt of destroying and injuring life. But as an ethical being he strives to escape whenever possible from this necessity, and as one who has become enlightened and merciful to put a stop to this disunion (Selbstentzweiung) of the Will-to-Live so far as the influence of his own existence reaches. He thirsts to be permitted to preserve his humanity, and to be able to bring to other existences release from their sufferings.

"Reverence for Life arising from the Will-to-Live that has become reflective therefore contains affirmation of life and ethics inseparably combined. It aims to create values, and to realize progress of different kinds which shall serve the material, spiritual, and ethical development of men and mankind. While the unthinking modern acceptance of life stumbles about with its ideals of power won by discovery and inven-

tion, the acceptance of life based on reason sets up the spiritual and ethical perfecting of mankind as the highest ideal, and an ideal from which alone all other ideals of progress get their real value." [1]

If affirmation of life and ethics are inseparably combined, it indeed would be unethical to carry out the literal provisions of paragraph five of decedent's will. Paragraph 5 of decedent's will would confiscate the life of the two setters for no purpose. It would be an act of cruelty that is not sanctioned by the traditions and purposes of this court, and would conflict with its established public policy.

This same concept is reflected in the letters written to the court in this case and contained in the news media brought to the attention of the court.

John R. Rood, in his work "A Treatise On The Law Of Wills," 1926 edition, page 30, in quoting Swinburne, stated the following:

" 'The testator cannot command anything that is wicked, or against justice, piety, equity, etc. . . . Therefore, if the testator should command any such thing in his testament, the same is not to be observed. As if he should will any man to be murdered, for this is against the law of God; or if he should command his body to be cast into the river; for this is against humanity; or if he should command his goods to be burned, for this is against policy; . . .' "

In Jarman on Wills, Sixth Edition, page 207, the famous writer says:

"Nor can a testator direct that his property shall not be occupied or used for a certain period. Thus in *Brown* v. *Burdett (c)*, a testratrix devised buildings to trustees upon trust that they should be blocked up

---

[1] From OUT OF MY LIFE AND THOUGHT by Albert Schweitzer. Copyright 1933, 1949 by Holt, Rinehart and Winston, Inc. Used by permission of Holt, Rinehart and Winston, Inc.

for twenty years; it was held that this direction was nugatory, and that there was an intestacy during the twenty years."

The general hue and cry against the destruction of these two animals was felt so strongly that the Attorney General of the State of Pennsylvania intervened for the purpose of preserving their lives.

The Attorney General, who was represented at the hearing on this matter by Special Assistant Attorney General William Howard Colbert, states that the testamentary direction to destroy the dogs is against public policy and offers the following:

"The Supreme Court of Pennsylvania in its decision in re *Mohler's Estate*, 343 Pa. 299 (1941), sets forth at page 303 of the opinion how public policy of a state is established. The three methods there enumerated are: (1) by the Constitution and laws of the state, or; (2) by judicial decisions of the courts of the state; or (3) by general consent. Perhaps the best statement on public policy is to be found in the opinion of *Mamlin v. Genoe*, et al, 340 Pa. 320 (1941), wherein the court stated at page 325 as follows:

" 'It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal. . . . Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.' "

Here, there is a unanimity of opinion that to destroy these two Irish setters that have displayed nothing but fidelity and affection, would be an act of gross inhumanity.

The facts in this case are within that group of cases that are labeled "the clearest cases" of violation of public policy and it is, therefore, the basis for legal decision.

In the Estate of India F. Webster, County Court of Pinellas County, Florida (1942), where decedent's will ordered her dog destroyed immediately after her death, the court held that section of the will void and ineffectual as being opposed to public policy and contrary to the spirit of the law.

In the Board of Commissioners v. Jasper Scott and Others, 88 Minn. 386, where there was a direction as follows: "It is my will, and I hereby direct, that my executor above named, after paying all my just debts and expenses, shall destroy all the rest and residue of the money or cash or other evidence of credit that to me or to my estate may belong." Chief Justice Start said: "We assume, for the purpose of this decision, that the direction in the codicil to the executor to destroy all of the residue of the money or cash or evidences of credit belonging to the estate was void."

The above cases illustrate that American courts will not uphold testamentary provisions directing the destruction of animals or any other valuable property.

Some of the letters to the court and newspaper articles that have been called to the attention of the court are placed in the record of this case as some evidence that there is a positive, well-defined and universal public sentiment, deeply integrated in the customs and beliefs of the people of this era, opposed to the unnecessary destruction of animals.

The counsel for the executors objects to these letters and newspaper articles being a part of the record. The rules of evidence justify the objection of counsel. However, this is an unusual case. The Attorney General of the State has intervened. The public has an interest.

The letters and newspaper articles exhibit the interest of the people. The record should reveal what the public has written to the court. For these reasons, the court will make the letters and newspaper articles a part of the record.

Even if the letters and newspaper articles are excluded, the bare record is sufficient to convince the court that public policy of the Commonwealth of Pennsylvania is a factor in this case and the court concurs with the contention of the Attorney General that the aforementioned provision of the will is unenforceable as being against the settled public policy of this Commonwealth.

This brings us to the fourth question involved: Did decedent, Ida M. Capers, have a right under the Wills Act to order her executors to destroy the two Irish setters that were the property of her estate?

Whatever right exists to have the provisions of decedent's will carried out must be found in the Wills Act in force at the time of the death of decedent.

It is well known that in England, until recent period, the practice of allowing the owner of property to dispose of it after death, was exercised under considerable restriction. See Maginn's Estate, 278 Pa. 89, at page 91.

The purpose of the statutes of 32 and 34, Henry VIII, and all subsequent statutes, was to authorize the owner of property to pass on that property to other owners. The right to make a will was never intended to bestow on an owner of property the right to order it destroyed after his death.

The late Professor A. J. White Hutton, in his Treatise on the Law of Wills in Pennsylvania, published in 1933 (Soney and Sage Co.), quoting Brown, J., said on page 15:

"While the laws of all civilized states recognize in every citizen the absolute right to his own earnings and

to the enjoyment of his own property, and the increase thereof during his life, except so far as the state may require him to contribute his share for public expenses, the right to dispose of his property by will has always been considered purely a creature of statute and within legislative control."

The brief of William Howard Colbert, Esquire, of the Attorney General's Office, makes a very valid and convincing point and will be quoted as follows:

". . . the Wills Act of 1947 (1947), April 24, P. L. 89, 20 PS §180.1, et seq. It is not necessary to go beyond the first paragraph of this Act which reads as follows:

" 'Any person of sound mind twenty-one years of age or older may by will *dispose* of all his real and personal estate subject to payment of debts and charges.' (Italics supplied.)

"There are certain general principles of law which we should examine at this point. The right to make a Will exists only by virtue of statutes: . . . *Maginn's Estate*, 278 Pa. 89 (1923). The right to take under a Will is a privilege: . . . *McKinsley's Estate*, 296 Pa. 185 (1929). So long as disposition be lawful, a testator may do as he likes with his property: . . . *Thompson's Estate*, 304 Pa. 349 (1931). A person may dispose of his own property as he pleases within the limits permitted by law: . . . *Bumm's Estate*, 306 Pa. 269 (1932). The right of a testator to dispose of his estate as he pleases must be given full effect when it is not contrary to law: . . . *Bryant's Estate*, 315 Pa. 151 (1934). The right to transmit or receive property by will or through intestacy is not a natural right, but a creature of statutory grant: . . . *Tack's Estate*, 325 Pa. 545 (1937). See also P. L. E. Wills, Section 1.

"As we examine the Wills Act and the opinions in the cases above cited, we find one word which appears in every opinion, and in the very first paragraph of

the Wills Act, the word 'dispose'. What does this word mean? Webster's International Dictionary defines dispose to mean 'to distribute and put in place; to arrange; to set in order; to settle; to determine; to bestow for an object or purpose,' and cites as synonyms the words 'arrange, order, distribute, adjust, regulate, adapt, fit, bestow, give.' The Pennsylvania Supreme Court has found it necessary in a number of instances to interpret the meaning of the word 'dispose'. In a Philadelphia case, *Kempinski v. Green*, 282 Fed. 2nd 820 (1961), it was held that the verb dispose means to regulate, adjust, or settle. In 1883 Chief Justice Gibson stated in *Gordon v. Preston*, 1 Watts, 385, that the words 'dispose of' meant 'to part with.' The Gordon case involved real estate, but the Court was very direct in its thinking. See also, *Lancaster v. Dolan*, 1 Rawle, 231 (1829). However, in *Marrs' Estate*, 240 Pa. 38 (1913), at page 42, the Court held in interpreting words in a Will, that the word *dispose* had the same meaning as its synonym 'settle.'

"Perhaps the best discussion is to be found in *Brown Estate*, 289 Pa. 101 (1927). This was a proceeding under the Uniform Declaratory Judgment Act upon a petition of a nephew and niece of decedent to determine the disposition of decedent's residuary estate, and in order to arrive at a decision it was necessary to interpret the meaning of certain words. Chief Justice Moschzisker, in giving the opinion of the Court, at page 117, referring to certain language used by testatrix affecting the ultimate remainderman, found that the word 'disposition' meant the alienation or bestowal of property. He said '*to dispose of a thing is to direct its subsequent ownership . . . .*' (Italics supplied.)

"From the above it can be seen that the word 'dispose' as used in the Wills Act can mean but one thing and that is that a person, by virtue of said law, has the right after his or her death to direct where said

property shall go and by whom it shall be enjoyed. *There is no definition or any interpretation to be found in any cases which enlarges the meaning of the word 'dispose' to include destroy."*

In the light of the authorities above cited, the court is of the opinion that testatrix had no right under the Wills Act to order her executors to destroy the two Irish setters after her death.

This brings us to the fifth consideration as to what is the present status of the Irish setters, Brickland and Sunny Birch. At the audit and at the date of the hearing, of which all parties were notified, the only party to appear and make an offer for the dogs, was the kennel keeper, Thomas L. Miller. There had been substantial offers for the two Irish setters at previous times, but at the date of the audit when the parties should have known that they had to be in court and make their bid for this property of decedent, they failed to do so.

The court, at the time of the audit, allowed $24 per week to the kennel keeper of the two setters. The dogs have been with Thomas L. Miller since January 1963, a period of approximately 98 weeks. Mr. Miller, therefore, would be entitled to approximately $2,500 for keeping these animals. The testimony indicates that Mr. Miller testified that he would waive the cost of keeping Brickland and Sunny Birch, for the privilege of obtaining their ownership. Ordinarily, there is a right of lien for boarding animals; however, there appears to be no such right in this case. 107 A. L. R. 1072 states the following to be the law:

*"At common law agisters had no lien* for the care and keep of animals bailed to them, as they were not considered within the operation of the rule which gives a lien to those who by their labor and skill have increased the value of a chattel bailed, nor within the operation of the rule which gives a lien to an innkeeper

for the reason that he is bound to entertain and provide for anyone who presents himself in the character of a guest, and various *statutes* were adopted to remedy this omission and assure those who undertook the care and feeding of animals certain compensation, and while some conflict of authority is traceable in the decisions *which construe these statutes,* it must be observed that in each instance the outcome arrived at, and for the most part the reason assigned, are based upon the express language of the statute under consideration." (Italics supplied.)

It is plain, therefore, that while Mr. Thomas Miller has no lien for the maintenance of the animals, by agreeing to retain them and to waive his claim for their maintenance he has made an offer of approximately $2,304 for them. The acceptance of this offer would be a prudent disposition of a claim against this estate.

While this would be a prudent disposition of the two animals, section 14, subsection 9 of the Wills Act of 1947 makes definite provision for a situation where a bequest fails or is void. This section provides:

"(9) LAPSED AND VOID DEVISES AND LEGACIES—SHARES NOT IN RESIDUE. A devise or bequest not being part of the residuary estate which shall fail or be void because the beneficiary fails to survive the testator or *because it is contrary to law or otherwise incapable of taking effect* or which has been revoked by the testator or is undisposed of or is released or disclaimed by the beneficiary, if it shall not pass to the issue of the beneficiary under the provisions of clause (8) hereof, and if the disposition thereof shall not be otherwise expressly provided for by law, shall be included in the residuary devise or bequest, if any, contained in the will." (Italics supplied.)

The beneficiary under the residuary clause of decedent's will in this case is the Western Pennsylvania Humane Society. Under the said section of the Wills

Act, the two Irish setters of decedent become the property of the society and if the court should so decree, it is clear that the estate would be bound to pay for the maintenance of the setters for the entire period they were in the custody of Mr. Thomas Miller.

Do the executors have a duty to appeal from this order?

In carrying out the prayer of the petition of the executors, we are required to pass on the question of whether or not the executors have a right of appeal. The prayer of the executors' petition is as follows:

"WHEREFORE, your petitioners pray your Honorable Court that said *question of the rights and duties of your petitioners* by reason of the provisions of the Fifth Paragraph of said Last Will will be adjudicated and determined in accordance with the aforementioned provisions of the Act of 1923, June 18, P. L. 840." (Italics supplied.)

The executors are not an interested party with the right of appeal. 20 PS §2080.771 provides as follows:

"Any party in interest who is aggrieved by a final order or decree of the orphans' court, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom to the proper appellate court. An appeal in like manner may be taken from a decree of distribution of the orphans' court which is not final within the meaning of this section, provided the orphans' court shall certify that the decree is sufficiently definite to determine the substantial issues between the parties": 1951, Aug. 10, P. L. 1163, art. VII, section 771.

This is the statute that authorizes appeals from decrees of this court.

The executors are not aggrieved by this order.

The executors have no pecuniary interest in the outcome of the litigation. The executors here are not distributees. The executors, as such, have no general right

of appeal from a decree of distribution, nor does the fact that they are given a duty under the will that the court forbids them to carry out, give them a right of appeal.

Only a person having a financial interest may appeal from the order of the Orphans' Court: Hunter, vol. 1, p. 122.

The court will withhold a decree of distribution for a period of 20 days, to enable the Western Pennsylvania Humane Society and Mr. Thomas Miller to come to an arrangement with reference to these dogs which will be satisfactory to the said parties and in accordance with the foregoing opinion.

### Decree

And now, to wit, November 12, 1964, the above case having been heard and briefs having been filed and the prayer for a declaratory judgment having been considered, it is ordered, adjudged and decreed that the fifth paragraph of decedent's will providing for the destruction of the two Irish setters, "Brickland" and "Sunny Birch", is void as not being within the purview of the Wills Act of the Commonwealth of Pennsylvania, and being against the public policy of the Commonwealth of Pennsylvania.

It appearing that the Western Pennsylvania Humane Society, the residuary legatee to whom the dogs would pass under the will, in view of the invalidity of paragraph fifth, has adopted a resolution whereby it would award custody of the two Irish setters to Mr. and Mrs. Thomas L. Miller, it is further ordered, adjudged and decreed that a decree of distribution be withheld for a period of 20 days, pending an agreement between the Western Pennsylvania Humane Society and Mr. and Mrs. Thomas L. Miller, relative to the custody of the two Irish setters, not inconsistent with the opinion filed in this case.