**Dr. Edward L. EYERMAN et al.,**
**Plaintiffs-Appellants,**

**v.**

**MERCANTILE TRUST CO., N.A., et al.,**
**Defendants-Respondents.**

No. 35699.

Missouri Court of Appeals,
St. Louis District,
Division One.

April 22, 1975.

Motion for Rehearing or to Transfer to Supreme Court Denied June 12, 1975.
Application to Transfer Denied
July 14, 1975.

Armstrong, Teasdale, Kramer & Vaughan, Edwin S. Fryer, St. Louis, for plaintiffs-appellants.

Harry W. Kroeger, Lashly, Caruthers, Rava, Hyndman & Rutherford, Michael C. Walther, Thompson, Mitchell, Douglas, Neill, Guerri & Elbert, Fred E. Arnold, St. Louis, for defendants-respondents.

RENDLEN, Judge.

Plaintiffs appeal from denial of their petition seeking injunction to prevent demolition of a house at # 4 Kingsbury Place in the City of St. Louis. The action is brought by individual neighboring property owners and certain trustees for the Kingsbury Place Subdivision. We reverse.

Louise Woodruff Johnston, owner of the property in question, died January 14, 1973, and by her will directed the executor ". . . to cause our home at 4 Kingsbury Place . . . to be razed and to sell the land upon which it is located . . . and to transfer the proceeds of the sale . . . to the residue of my estate." Plaintiffs assert that razing the home will adversely affect their property rights, violate the terms of the subdivision trust indenture for Kingsbury Place, produce an actionable private nuisance and is contrary to public policy.

The area involved is a "private place" established in 1902 by trust indenture which provides that Kingsbury Place and Kingsbury Terrace will be so maintained, improved, protected and managed as to be desirable for private residences. The trustees are empowered to protect and preserve "Kingsbury Place" from encroachment, trespass, nuisance or injury, and it is "the

intention of these presents, forming a general scheme of improving and maintaining said property as desirable residence property of the highest class." The covenants run with the land and the indenture empowers lot owners or the trustees to bring suit to enforce them.

Except for one vacant lot, the subdivision is occupied by handsome, spacious two and three-story homes, and all must be used exclusively as private residences. The indenture generally regulates location, costs and similar features for any structures in the subdivision, and limits construction of subsidiary structures except those that may beautify the property, for example, private stables, flower houses, conservatories, play houses or buildings of similar character.

On trial the temporary restraining order was dissolved and all issues found against the plaintiffs.

Defendants question plaintiffs' standing to bring this suit, arguing that plaintiffs are not parties in interest who may invoke the rights of beneficiaries of the will against a trustee to enforce a trust or enjoin its breach, citing Restatement, Second, Trusts § 200. This is not such a suit. Plaintiffs' action is not to invoke the rights of beneficiaries of the will for enforcement of a trust or to enjoin its breach; instead, they seek protection of competing interests shared by themselves and the general community against a capricious condition of a will directing the defendant-executor to destroy estate property. If appellants are successful, important rights personal to plaintiffs and the public will be vindicated and it is only incidental that the effect on decedent's estate will increase funds available for distribution to the beneficiaries. Here the gift is not a devise of particular land to specific beneficiaries, but instead testatrix's house is to be razed and the lot converted to cash. From this we find no intent to preserve the land for a settled purpose or the use of any person or group;

instead, it becomes a gift of money, indefinite as to amount, for the residual estate.

The issues, simply stated, involve: (1) Private nuisance; (2) enforcement of restrictive covenants and (3) public policy.

■ Plaintiffs clearly have standing to raise the issues of nuisance abatement and enforcement of the restrictive covenants in the subdivision indenture. Persons threatened with wrongful interference of property rights may seek injunction against a threatened nuisance, Lee v. Rolla Speedway, Inc., 494 S.W.2d 349 (Mo.1973), and the trust indenture regulating Kingsbury Place empowers the trustees or any property owner to bring suit to enforce the covenants. Under Rule 52.01 [1] trustees of an express trust may bring a civil action in their own names in such representative capacity. As to plaintiffs' standing to raise the public policy issue, we must determine whether plaintiffs alleged a legally protectible interest. Allen v. Coffel, 488 S.W.2d 671, 674 (Mo.App.1972); Smith v. Cowen, 350 S.W.2d 96 (Mo.App.1961); Rule 52.01. Though defendants cite no authority on the question of whether private individuals have a legally protectible interest sufficient to give them standing to raise public policy issues, the question has been examined by federal courts in recent years. In United States v. S.C.R.A.P., 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Supreme Court held that members of an environmental organization had standing to challenge a railroad surcharge on shipping rates of recyclable materials on allegation that the higher rates would discourage the use of recyclable waste materials and promote increased use of new raw materials, thus adversely affecting the environment. Plaintiffs pleaded, more specifically, the environment surrounding their legal residences would be affected, causing them direct, personal injury. The Supreme Court recognized the test for standing as whether plaintiffs alleged that they had been or will

1. All references are to V.A.M.R. unless otherwise indicated.

in fact be perceptibly harmed by the challenged action, not merely that they can imagine circumstances in which they might be harmed or that the actions are generally undesirable. This concept was restated in Coalition for the Environment v. Volpe, 504 F.2d 156, 165 (8th Cir. 1974), noting a dual test of whether the challenged action will cause plaintiffs injury in fact, and whether the injury is within the "zone of interests" created by statutes which plaintiffs contended were being violated, suggesting the need for a causal relationship between the action challenged and the injury complained of.

In *Volpe* the 8th circuit granted standing to individuals living near a property development who alleged that they would be injured by increased traffic and loss of open space. According to the court, such allegations constituted "statements of specific injury experienced by ascertainable individuals who reside near or pass through the affected area." Coalition for the Environment v. Volpe, *supra* at 167. These considerations are applicable even when plaintiffs raise aesthetic or environmental interests which they wish to protect, or that these interests may be common to the entire community, so long as the named plaintiffs are threatened with specific, personal injury. "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection . . ." Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). See United States v. S.C.R.A.P., *supra*, 412 U.S. at 687, 93 S.Ct. 2405.

Whether # 4 Kingsbury Place should be razed is an issue of public policy involving individual property rights and the community at large. The plaintiffs have pleaded and proved facts sufficient to show a personal, legally protectible interest.

Demolition of the dwelling will result in an unwarranted loss to this estate, the plaintiffs and the public. The uncontradicted testimony was that the current value of the house and land is $40,000.00; yet the estate could expect no more than $5,000.00 for the empty lot, less the cost of demolition at $4,350.00, making a grand loss of $39,350.00 if the unexplained and capricious direction to the executor is effected. Only $650.00 of the $40,000.00 asset would remain.

Kingsbury Place is an area of high architectural significance, representing excellence in urban space utilization. Razing the home will depreciate adjoining property values by an estimated $10,000.00 and effect corresponding losses for other neighborhood homes. The cost of constructing a house of comparable size and architectural exquisiteness would approach $200,000.00.

The importance of this house to its neighborhood and the community is reflected in the action of the St. Louis Commission on Landmarks and Urban Design designating Kingsbury Place as a landmark of the City of St. Louis. This designation, under consideration prior to the institution of this suit, points up the aesthetic and historical qualities of the area and assists in stabilizing Central West End St. Louis. It was testified by the Landmarks Commission chairman that the private place concept, once unique to St. Louis, fosters higher home maintenance standards and is among the most effective methods for stabilizing otherwise deteriorating neighborhoods. The executive director of Heritage St. Louis, an organization operating to preserve the architecture of the city, testified to the importance of preserving Kingsbury Place intact: [2]

"The reasons [sic] for making Kingsbury Place a landmark is that it is a definite

---

2. # 4 Kingsbury Place was rated as being "highly architecturally significant".

piece of urban design and architecture. It starts out with monumental gates on Union. There is a long corridor of space, furnished with a parkway in the center, with houses on either side of the street, . . . The existence of this piece of architecture depends on the continuity of the [sic] both sides. Breaks in this continuity would be as holes in this wall, and would detract from the urban design qualities of the streets. And the richness of the street is this belt of green lot on either side, with rich tapestry of the individual houses along the sides. Many of these houses are landmarks in themselves, but they add up to much more . . . I would say Kingsbury Place, as a whole, with its design, with its important houses . . . is a most significant piece of urban design by any standard."

To remove # 4 Kingsbury from the street was described as having the effect of a missing front tooth. The space created would permit direct access to Kingsbury Place from the adjacent alley, increasing the likelihood the lot will be subject to uses detrimental to the health, safety and beauty of the neighborhood. The mere possibility that a future owner might build a new home with the inherent architectural significance of the present dwelling offers little support to sustain the condition for destruction.

■ We are constrained to take judicial notice[3] of the pressing need of the community for dwelling units as demonstrated by recent U.S. Census Bureau figures showing a decrease of more than 14% in St. Louis City housing units during the decade of the 60's. This decrease occurs in the face of housing growth in the remainder of the metropolitan area.[4] It becomes apparent that no individual, group of individuals nor the community generally benefits from the senseless destruction of the house; instead, all are harmed and only the caprice of the dead testatrix is served. Destruction of the house harms the neighbors, detrimentally affects the community, causes monetary loss in excess of $39,000.00 to the estate and is without benefit to the dead woman. No reason, good or bad, is suggested by the will or record for the eccentric condition. This is not a living person who seeks to exercise a right to reshape or dispose of her property; instead, it is an attempt by will to confer the power to destroy upon an executor who is given no other interest in the property. To allow an executor to exercise such power stemming from apparent whim and caprice of the testatrix contravenes public policy.

■ The Missouri Supreme Court held in State ex rel. McClintock v. Guinotte, 275 Mo. 298, 204 S.W. 806, 808 (banc 1918), that the taking of property by inheritance or will is not an absolute or natural right but one created by the laws of the sovereign power. The court points out the state "may foreclose the right absolutely, or it may grant the right upon conditions precedent,

---

3. State ex rel. Kopper Kettle Restaurants, Inc. v. City of St. Robert, 424 S.W.2d 73[11] (Mo.App.1968); State ex rel. State Highway Commission v. Galeener, 402 S.W.2d 336[2] (Mo.1966); McCormick, Evidence (2nd Ed.) § 331.

4.

| | OWNER OCCUPIED UNITS | | |
| --- | --- | --- | --- |
| | 1960 | 1970 | Change |
| Metropolitan Area without St. Louis | 269,873 | 347,443 | +29% |
| St. Louis City | 68,967 | 62,359 | −10% |
| | RENTER OCCUPIED UNITS | | |
| Metropolitan Area without St. Louis | 82,539 | 128,005 | +55% |
| St. Louis City | 153,771 | 127,620 | −17% |

The figure of 14% represents the total decline of owner occupied and renter occupied units.

SOURCE: Census of Housing, United States Census Bureau, St. Louis SMSA Abstract.

which conditions, if not otherwise violative of our Constitution, will have to be complied with before the right of descent and distribution (whether under the law or by will) can exist." Further, this power of the state is one of inherent sovereignty which allows the state to "say what becomes of the property of a person, when death forecloses his right to control it." McClintock v. Guinotte, *supra* at 808, 809. While living, a person may manage, use or dispose of his money or property with fewer restraints than a decedent by will. One is generally restrained from wasteful expenditure or destructive inclinations by the natural desire to enjoy his property or to accumulate it during his lifetime. Such considerations however have not tempered the extravagance or eccentricity of the testamentary disposition here on which there is no check except the courts.

In the early English case of Egerton v. Brownlow, 10 Eng.Rep. 359, 417 (H.L.C. 1853), it is stated: "The owner of an estate may himself do many things which he could not (by a condition) compel his successor to do. One example is sufficient. He may leave his land uncultivated, but he cannot by a condition compel his successor to do so. The law does not interfere with the owner and compel him to cultivate his land, (though it may be for the public good that land should be cultivated) so far the law respects ownership; but when, by a condition, he attempts to compel his successor to do what is against the public good, the law steps in and pronounces the condition void and allows the devisee to enjoy the estate free from the condition." A more recent application of this principle is found in M'Caig's Trustees v. Kirk-Session of the United Free Church of Lismore, et al., 1915 Sess.Cas. 426 (Scot.). There, by codicil to her will, testatrix ordered certain statues erected to honor her family in a tower built in the form of an amphitheater on a hill. Balustrades were to be erected so that even the public would have no access inside the tower. Special provision was made for keeping out the public and the ground enclosed was expressly declared to be a private enclosure. There were no living descendants of any member of the family who might, if so permitted, take pleasure in contemplating the proposed statues. The court states at 434: "If a bequest such as in Miss M'Caig's codicil were held good, money would require to be expended in perpetuity merely gratifying an absurd whim which has neither reason nor public sentiment in its favor." In striking down the provisions of the codicil, the court further notes that there is indeed a "difference between what a man, uncognosed, may do at his own hand, and what the law will support under the provisions of his will . . . therefore, without being illegal in the sense of being contrary to any express rule of the common law or contrary to any statute, the principle of public policy will prevent such post-mortem expenditure. Whether the act is sufficiently contrary to public policy to warrant the court's interference must depend on the degree to which it is against public policy." The court further observed that the erection of the eleven statues "would be of no benefit to anyone except those connected with the carrying out of the work, for whose interest she expresses no concern." M'Caig's Trustees v. Kirk-Session of the United Free Church of Lismore, et al., *supra* at 438. In the case sub judice, testatrix similarly expressed no such concern; nothing in the will or record indicates an intent to benefit any razing company called upon to destroy her beautiful home.

In the case of In re Scott's Will, Board of Commissioners of Rice County v. Scott et al., 88 Minn. 386, 93 N.W. 109 (1903), the Supreme Court of Minnesota stated, when considering the provision of a will directing the executor to destroy money belonging to the estate: "We assume, for purpose of this decision, that the direction in the codicil to the executor to destroy all of the residue of the money or cash or evidences of credit belonging to the estate was void." In re

Scott's Will, *supra* at 109. See also Restatement, Second, Trusts § 124, at 267: "Although a person may deal capriciously with his own property, his self interest ordinarily will restrain him from doing so. Where an attempt is made to confer such a power upon a person who is given no other interest in the property, there is no such restraint and it is against public policy to allow him to exercise the power if the purpose is merely capricious." The text is followed by this illustration: "A bequeaths $1,000.00 to B in trust to throw the money into the sea. B holds the money upon a resulting trust for the estate of A and is liable to the estate of A if he throws the money into the sea." Restatement, *supra* at 267.

In Brown v. Burdett, 21 Chan.Div. 667 (Eng.1882), the testatrix devised her house with directions that the doors and windows be boarded, shuttered, bricked and sealed, to be held by the trustees in this wasteful manner for twenty years and thereafter to the named beneficiaries as tenants in common. This provision was stricken by the court at 673: "I think I must 'unseal' this useless, undisposed of property." The provision of the will was void and found to be a nullity and the court declared that the house and premises were undisposed of by will for a term of twenty years from the testatrix's death.

In Restatement, Second, Trusts § 124(g), at 267, the writers suggest this hypothesis as an illustration of the principle involved in Brown v. Burdett, *supra:*

> "A devises a house and lot to B 'in trust' to block up the windows and doors and leave the house vacant for 20 years. B holds the house and lot upon a resulting trust for the estate of A and is liable to the estate of A if he blocks up the windows and doors."

It is important to note that the purposes of testatrix's trust will not be defeated by injunction; instead, the proceeds from the sale of the property will pass into the residual estate and thence to the trust estate as intended, and only the capricious destructive condition will be enjoined.

In Colonial Trust Co. v. Brown et al., 105 Conn. 261, 135 A. 555 (1926) the court invalidated, as against public policy, the provisions of a will restricting erection of buildings more than three stories in height and forbidding leases of more than one year on property known as "The Exchange Place" in the heart of the City of Waterbury. The court stated:

> " 'As a general rule, a testator has the right to impose such conditions as he pleases upon a beneficiary as conditions precedent to the vesting of an estate in him, or to the enjoyment of a trust estate by him as cestui que trust. He may not, however, impose one that is uncertain, unlawful, or opposed to public policy.'

> \* \* \* \* \* \*

In the instant case, the length of time during which the testator directed that the property should remain in the trust, and the complete uncertainty as to the individuals to whom it would ultimately go, preclude any thought of an intent on his part to forbid the cumbering of the property by long leases or the burdening of it with large buildings, lest the beneficiaries be embarrassed in the development of it along such lines as they might themselves prefer. The only other purpose which can be reasonably attributed to him is to compel the trustee to follow his own peculiar ideas as to the proper and advantageous way to manage such properties. That the restrictions are opposed to the interests of the beneficiaries of the trust and that they are imprudent and unwise is made clear by the statement of agreed facts, but that is not all, for their effect is not confined to the beneficiaries. The Exchange Place property is located at a corner of the public square in the very center of the city of Waterbury, in the heart of the financial

and retail business district, is as valuable as any land in the city, and is most favorably adapted for a large building containing stores and offices, and the homestead is located in the region of changing character, so that its most available use cannot now be determined. To impress the restrictions in question upon these properties, as the statement of agreed facts makes clear, makes it impossible to obtain from them a proper income return or to secure the most desirable and stable class of tenants, requires for the maintenance of the buildings a proportion of income greatly in excess of that usual in the case of such properties, and will be likely to preclude their proper development and natural use. The effect of such conditions cannot but react disadvantageously upon neighboring properties, and to continue them, as the testator intended, for perhaps 75 years or even more, would carry a serious threat against the proper growth and development of the parts of the city in which the lands in question are situated. *The restrictions militate too strongly against the interests of the beneficiaries and the public welfare to be sustained, particularly when it is remembered that they are designed to benefit no one, and are harmful to all persons interested, and we hold them invalid as against public policy.*" l.c. 564. (Emphasis ours.)

See also Restatement, Second, Trusts § 166(b), pp. 348–349, and illustration at p. 349.

The term "public policy" cannot be comprehensively defined in specific terms but the phrase "against public policy" has been characterized as that which conflicts with the morals of the time and contravenes any established interest of society. Acts are said to be against public policy "when the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interests of the state, apart from illegality or immorality." Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W.2d 615, 620 (1946); Brawner v. Brawner, 327 S.W.2d 808, 812 (Mo. banc 1959).

■ Public policy may be found in the Constitution, statutes and judicial decisions of this state or the nation. In re Rahn's Estate, 316 Mo. 492, 291 S.W. 120 (1927). But in a case of first impression where there are no guiding statutes, judicial decisions or constitutional provisions, "a judicial determination of the question becomes an expression of public policy provided it is so plainly right as to be supported by the general will." In re Mohler's Estate, 343 Pa. 299, 22 A.2d 680, 683 (1941). In the absence of guidance from authorities in its own jurisdiction, courts may look to the judicial decisions of sister states for assistance in discovering expressions of public policy. In re Rahn's Estate, *supra* at 125.

Although public policy may evade precise, objective definition, it is evident from the authorities cited that this senseless destruction serving no apparent good purpose is to be held in disfavor. A well-ordered society cannot tolerate the waste and destruction of resources when such acts directly affect important interests of other members of that society. It is clear that property owners in the neighborhood of # 4 Kingsbury, the St. Louis community as a whole and the beneficiaries of testatrix's estate will be severely injured should the provisions of the will be followed. No benefits are present to balance against this injury and we hold that to allow the condition in the will would be in violation of the public policy of this state.

Having thus decided, we do not reach the plaintiffs' contentions regarding enforcement of the restrictions in the Kingsbury Place trust indenture and actionable private nuisance, though these contentions may have merit.[5]

5. The dissenting opinion suggests this case be decided under the general rule that an

owner has exclusive control and the right to untrammeled use of real property, citing

The judgment is reversed and the cause remanded to the Circuit Court to enter judgment as prayed.

DOWD, P. J., concurs.

CLEMENS, J., dissents in separate opinion.

CLEMENS, Judge (dissenting).

I dissent.

My initial, but not dominant, concern is the inadequacy of plaintiffs' brief. Despite the mandate of Rule 84.04(c) that an appellant's brief present a concise statement of relevant facts, plaintiffs' brief merely sets out separate testamentary summaries by each of ten witnesses. Such summaries are permissible to supplement, but not to supplant, a concise statement of relevant facts. Plaintiffs' inexcusable breach imposes upon the court a burden we should not assume, and this appeal should be dismissed for failure to comply with Rule 84.04(c). Donnell v. Vigus Quarries, Inc., 489 S.W.2d 223[3] (Mo.App.1972). In view of the majority opinion, however, I have considered the alternative of Rule 79.04, which allows us to rule a case on its merits if we find plain error constituting a miscarriage of justice. But I find no plain error here.

The simple issue in this case is whether the trial court erred by refusing to enjoin a trustee from carrying out an explicit testamentary directive. In an emotional opinion, the majority assumes a psychic knowledge of the testatrix' reasons for directing her home be razed; her testamentary disposition is characterized as "capricious," "unwarranted," "senseless," and "eccentric." But the record is utterly silent as to her motives.

The majority's reversal of the trial court here spawns bizarre and legally untenable results. By its decision, the court officiously confers a "benefit" upon testamentary beneficiaries who have never litigated or protested against the razing. The majority opinion further proclaims that public policy demands we enjoin the razing of this private residence in order to prevent land misuse in the City of St. Louis. But the City, like the beneficiaries, is not a party to this lawsuit. The fact is the majority's holding is based upon wispy, self-proclaimed public policy grounds that were only vaguely pleaded, were not in evidence, and were only sketchily briefed by the plaintiffs.

The only plaintiffs in this case are residents of Kingsbury Place and trustees under its indenture. In seeking to enjoin the removal of testatrix' home at # 4 Kingsbury Place, these plaintiffs claim they are entitled to an injunction first, by virtue of language in the trust indenture; secondly, because the razing would constitute a nuisance; and thirdly on the ground of public policy. But plaintiffs have not shown the indenture bars razing testatrix' home or that the razing would create a nuisance. And no grounds exist for ruling that the razing is contrary to public policy.

*The Trust Indenture.* Kingsbury Place is a "private place" established in 1902 by trust indenture. Except for one well-tended vacant lot (whose existence the majority

---

Reutner v. Vouga, 367 S.W.2d 34 (Mo.App. 1963), City of Fredericktown v. Osborn, 429 S.W.2d 17 (Mo.App.1968), and Gibbs v. Cass, 431 S.W.2d 662 (Mo.App.1968). Although maxims of this sort are attractive in their simplicity, standing alone they seldom suffice in a complex case. None of the cited cases pertains to the qualified right of testatrix to impose, post mortem, a condition upon her executor requiring an unexplained destruction of estate property; instead, they involve, respectively, surface water, use of property for commercial purposes and restrictive covenants as to subdivision lot sizes. Each acknowledges the principle of an owner's "free use" as the starting point but all recognize competing interests of the community and other owners of great importance. Accordingly, the general principle of "free and untrammeled" use is markedly narrowed, supporting in each case a result opposite that urged by the dissent in the case at bar.

ignores in saying the street minus # 4 Kingsbury Place would be like "a missing front tooth") the trust indenture generally regulates size, constructions and cost of structures to be built on Kingsbury Place. It empowers the trustees to maintain vacant lots and to protect the street from "encroachment, trespass, nuisance and injury." The indenture's acknowledgment that vacant lots did and would exist shows that such lots were not to be considered an "injury." The fact the indenture empowers the trustees to maintain vacant lots is neither an express nor an implied ban against razing residences. The indenture simply recognizes that Kingsbury Place may have vacant lots from time to time—as it now has—and that the trustees may maintain them—as they now do. The indenture itself affords plaintiffs no basis for injunctive relief.

*Nuisance.* Plaintiffs contend the non-existence of the Johnston dwelling would create a nuisance. Plaintiffs opined the home's removal would be detrimental to neighbors' health and safety, would lower property values in the area and would be undesirable aesthetically, architecturally, socially and historically. These opinions were based upon conjecture rather than upon a reasonable degree of certainty; hence, they were not binding on the trial court. Kinzel v. West Park Investment Corp., 330 S.W.2d 792[3] (Mo.1959); Abernathy v. Coca-Cola Bottling Co. of Jackson, 370 S.W.2d 175[1, 2] (Mo.App.1963). Plaintiffs' witnesses made questionable comparisons with other neighborhoods and speculated a nuisance would arise if the dwelling were removed. These witnesses concluded the lot would thereafter remain vacant, because the trustees would breach their duty under the indenture to maintain the lot, and because the existing private police patrol would no longer function. None of these conclusions have bases in fact. The record reveals the one existing vacant lot on Kingsbury Place is well-maintained by the trustees; it does not constitute a nuisance. There is no reason to presume a second vacant lot would be left untended or that private police would cease patrolling. The facts do not support an inference that plaintiffs' rights in the use of their own lands would be invaded by removing the Johnston home. They are not entitled to injunctive relief on the basis of imagined possibilities.

*Public Policy.* The majority opinion bases its reversal on public policy. But plaintiffs themselves did not substantially rely upon this nebulous concept. Plaintiffs' brief contends merely that an "agency of the City of St. Louis has recently [?] designated Kingsbury Place as a landmark," citing § 24.070, Revised Code of the City of St. Louis. Plaintiffs argue removal of the Johnston home would be "intentional . . destruction of a landmark of historical interest." Neither the ordinance cited in the brief nor any action taken under it were in evidence. Indeed, the Chairman of the Landmarks and Urban Design Commission testified the Commission did not declare the street a landmark until after Mrs. Johnston died. A month after Mrs. Johnston's death, several residents of the street apparently sensed the impending razing of the Johnston home and applied to have the street declared a landmark. The Commissioner testified it was the Commission's "civic duty to help those people."

The majority opinion goes far beyond the public-policy argument briefed by plaintiffs. It suggests the court may declare certain land uses, which are not illegal, to be in violation of the City's public policy. And the majority so finds although the City itself is not a litigant claiming injury to its interests. The majority's public-policy conclusions are based not upon evidence in the lower court, but upon incidents which may have happened thereafter.

The court has resorted to public policy in order to vitiate Mrs. Johnston's valid testamentary direction. But this is not a proper case for court-defined public policy.

In Asel *v.* Order of Commercial Travelers, 355 Mo. 658, 197 S.W.2d 639[1] (banc 1946), the court viewed as contrary to public policy any act that is inherently vicious and contrary to natural justice. The *Asel* court further cited as the definitive statement of public policy "the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare. 12 Am.Jur., § 666, now 12 Am. Jur.2d, § 175. But plaintiffs' theory below was that only the plaintiffs, not the public, were injured by the imminent demolition of the Johnston home.

The leading Missouri case on public policy as that doctrine applies to a testator's right to dispose of property is In re Rahn's Estate, 316 Mo. 492, 291 S.W. 120 [1, 2] (banc 1927), cert. den. 274 U.S. 745, 47 S.Ct. 591, 71 L.Ed. 1325. There, an executor refused to pay a bequest on the ground the beneficiary was an enemy alien, and the bequest was therefore against public policy. The court denied that contention: "We may say, at the outset, that the policy of the law favors freedom in the testamentary disposition of property and that it is the duty of the courts to give effect to the intention of the testator, as expressed in his will, provided such intention does not contravene an established rule of law." And the court wisely added, "it is not the function of the judiciary to create or announce a public policy of its own, but solely to determine and declare what is the public policy of the state or nation as such policy is found to be expressed in the Constitution, statutes, and judicial decisions of the state or nation,[1] . . . not by the varying opinions of laymen, lawyers, or judges[2] as to the de-

mands or the interests of the public." And, in cautioning against judges declaring public policy the court stated: "Judicial tribunals hold themselves bound to the observance of rules of extreme caution when invoked to declare a transaction void on grounds of public policy, and prejudice to the public interest must clearly appear before the court would be warranted in pronouncing a transaction void on this account." In resting its decision on public-policy grounds, the majority opinion has transgressed the limitations declared by our Supreme Court in *Rahn's Estate.*

The right of these plaintiffs to injunctive relief is by no means clear and injunction is "a harsh remedy, granted only in clear cases." American Pamcor, Inc., v. Klote, 438 S.W.2d 287[1] (Mo.App.1969). It requires judicial imagination to hold, as the majority does, that the mere presence of a second vacant lot on Kingsbury Place violates public policy.

As much as our aesthetic sympathies might lie with neighbors near a house to be razed, those sympathies should not so interfere with our considered legal judgment as to create a questionable legal precedent. Mrs. Johnston had the right during her lifetime to have her house razed, and I find nothing which precludes her right to order her executor to raze the house upon her death. It is clear that "the law favors the free and untrammeled use of real property." Gibbs v. Cass, 431 S.W.2d 662[2] (Mo. App.1968). This applies to testamentary dispositions. Mississippi Valley Trust Co. v. Ruhland, 359 Mo. 616, 222 S.W.2d 750[2] (1949). An owner has exclusive control

1. See also Phoenix Assurance Co. of N. Y. v. Royale Investment Co., 393 S.W.2d 43[1] (Mo.App.1965), holding "public policy is not an unknown and variable quantity upon which a valid judgment may be based. It is to be determined by the Constitution, the laws, and the judicial decisions of the State."

2. In his treatise on The Nature of the Judicial Process, p. 141, Mr. Justice Benjamin

Cardozo discussed the role of the judge as a legislator and warned: "The judge, even when he is free, is still not wholly free. He *is not to innovate at pleasure. He is not a* knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence."

over the use of his property subject only to the limitation that such use may not *substantially impair another's right to peaceably enjoy his property.* City of Fredricktown v. Osborn, 429 S.W.2d 17[2, 3] (Mo. App.1968), Reutner v. Vouga, 367 S.W.2d 34[11–13] (Mo.App.1963). Plaintiffs have not shown that such impairment will arise from the mere presence of another vacant lot on Kingsbury Place.

I find no plain error in the trial court's denial of injunctive relief, and on the merits I would affirm the trial court's judgment. Because of plaintiffs' defective brief, however, I would dismiss the appeal.