Norman B. HUDSON, as a representative of a class consisting of the members of the Kansas City Federation of Teachers, Local 691, AFL–CIO, an Unincorporated Association, and Lawrence R. Bates, as a representative of a class consisting of the members of the Kansas City School Administrator's Association, Plaintiffs-Appellants,

v.

The SCHOOL DISTRICT OF KANSAS CITY, Missouri, Defendants-Respondents.

Nos. KCD 29507–511.

Missouri Court of Appeals, Western District.

Feb. 26, 1979.

302

Thomas J. Cox, Jr., Kansas City, for plaintiff-appellant Bates.

Doyle R. Pryor, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, for plaintiff-appellant Hudson.

William H. Sanders, D. Brook Bartlett, John K. Brungardt, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for defendants-respondents.

Before SOMERVILLE, P. J., and SHANGLER and DIXON, JJ.

DIXON, Judge.

This consolidated appeal is from class action suits brought by Norman B. Hudson, representing the Kansas City Federation of Teachers, Local 691, AFL–CIO, and Lawrence R. Bates, representing the Kansas City School Administrator's Association, against the School District of Kansas City, Missouri. The suits attack proceedings by the School District which resulted in the furloughing of several hundred probationary teachers and reassignment of a large number of administrative employees. Filed as class actions, the suits allege violations of the Missouri "Sunshine Law" § 610.010 *et seq.* RSMo Supp.1975, by the School District's Board of Directors. The petitions were in two counts. The entire thrust of the suit was for injunctive relief. Count I sought a temporary injunction and a continuing injunction against future meetings as well as an injunction against implementation of the Board action. Count II requested mandatory relief by way of undoing the actions taken and monetary relief incident to the equitable claim.

Broadly stated, the contentions of the parties raise two basic issues of interpretation of the "Sunshine Law" § 610.010 *et seq.* RSMo Supp.1975. The first issue relates to the interpretation of the language of § 610.025 RSMo Supp.1975, *viz.,* "meetings relating to the hiring, firing, or promotion of personnel of a public governmental body may be a closed meeting, closed record, or closed vote."

The second issue is the scope of injunctive relief and the propriety of the trial court's refusal of such relief.

The parties, in the trial to the court for injunctive relief, developed the events at the challenged meetings in exhaustive detail. Summarily stated, the evidence developed the following:

The Kansas City, Missouri, School District Board of Directors, faced by a 7 million

dollar budget deficit for the coming fiscal year, met in executive sessions on April 4, 6, and 7, 1976. As announced by the Board president, the purpose of the closed meetings was "to consider a matter of personnel."

At the April 4 meeting, the major activity was a slide presentation by William D. Conklin, Assistant Superintendent in charge of Business. The purpose of the presentation "was to show the Board how the administration proposed to solve a 7.3 million-dollar problem . . ." The major proposals represented by the slides involved major program reductions, school closings, and cuts in areas such as transportation. The impact on personnel in the affected programs was shown not only by the dollars-saved figure, but by a number of employees in parentheses following each proposed program reduction. Both Mr. Conklin and Dr. Fields testified that, although it was announced at the first of the meeting that the discussion should be confined to personnel matters, there was some general discussion of the proposed program reductions.

The executive meeting was reconvened on April 6. At the first of the two sessions on that day, slides were shown to demonstrate the effect of eliminating the directors' position (an administrative position established under School District policy), and to show other proposed reorganizations of the School District's administration. Dr. Fields, acting Superintendent of Schools, had been asked to eliminate the directors' position at the April 4 meeting; the April 6 meeting reflected his response to that direction by the Board and to the other proposed reductions made during the April 4 meeting. No Board action was taken on the proposals at either the April 4 or the first April 6 meeting.

At the second session of the April 6 meetings, a session that was to last until the early hours of April 7, the Board took several major actions on the basis of the material presented at the earlier sessions. A group of 92 resource and remedial teachers were reappointed with an addition of $30 per month to their teacher salaries; 110 other employees had salary or assignment changes made. On motion, two individual teachers had their contracts terminated or not renewed for the next year.

As reflected by the record, the two most controversial actions taken by the Board, and the actions which resulted in these lawsuits, were the decision to reemploy 465 probationary teachers who would be put on unpaid leave of absence and the decision to reemploy 19 administrative employees in positions of diminished responsibility. The effect of these actions was to completely eliminate some programs by the elimination of the personnel in those programs. Programs involving school nurses, elementary industrial arts and physical education, elementary and secondary teachers' aides and secondary library clerks were affected by the budget cuts involving personnel.

That these presentations were, in fact, designed to provide the School Board with information to make policy decisions concerning the allocation of funds is an inescapable conclusion. Dr. Fields, the architect of the proposed changes, testified that the proposals had the effect of eliminating programs, and further, that the involved recommendations concerning maintenance reductions, school closings, and program eliminations by elimination of personnel in those programs. Dr. Fields also testified that the Board was considering options in resolving a "seven million dollar" problem. Dr. Fields stated that the selection of those persons to be "furloughed," as he expressed it, was to be made by the personnel department of the School District and not by the School Board. That the impelling motivation of the actions taken was a financial one and not a determination of merit, vis-a-vis the individual, is apparent from the minutes of the Board which deferred action on the elimination of the program of Home School Coordinators to see if funds were available for this program. The notices to the affected personnel likewise referred to a decline in enrollment and the financial condition of the district as the rationale for the furloughs and reassignments respectively. All

of the witnesses in the case were educators involved in the administration of the Kansas City School District or were Board members. Understandably, there was considerable sparring over semantics, but there is no real issue of credibility.

In short, as both parties concede and as the circuit court found, the actions at the meeting of the School Board "constituted the most massive reorganization of personnel in the history of the school district during the past thirty years."

Before discussion of the issues in detail, a review of the statutory provisions and the history of the Sunshine Law is helpful. In Missouri, the guiding provision is Chapter 610, enacted in 1973.[1] The relevant portions of that statute are as follows:

610.010. Definitions . . . (RSMo Supp.1977)

. . . (2) *"Public governmental body"*, any constitutional or statutory governmental entity, including any state body, agency, board, bureau, commission, committee, department, division, or any political subdivision of the state, of any county or of any municipal government, school district or special purpose district, and any other governmental deliberative body under the direction of three or more elected or appointed members having rule-making or quasi-judicial power;

(3) *"Public meeting"*, any meeting, formal or informal, regular or special, or any public governmental body, at which any public business is discussed, decided or public policy formulated; . . . . .

610.025. Closed meetings authorized, when

. . . (4) Any nonjudicial mental health proceedings and proceedings involving physical health, scholastic probation, scholastic expulsion or scholastic graduation, welfare cases, meetings relating to the hiring, firing or promotion of personnel of a public governmental body

may be a closed meeting, closed record, or closed vote.

610.030. Injunctive relief authorized.

The circuit court of this state shall have the jurisdiction to issue injunctions to enforce the provisions of sections 610.010 to 610.030 and 610.100 to 610.115.

There is no dispute here that the School Board of Kansas City is a public governmental body under § 610.010(2) RSMo Supp. 1977.

The purpose of the Sunshine Law has been delineated in two Missouri cases. *Cohen v. Poelker*, 520 S.W.2d 50 (Mo. banc 1975) and *Pulitzer Publishing Co. v. McNeal*, 575 S.W.2d 802 (Mo.App.1978). *Cohen v. Poelker, supra,* was the first test of the statute's constitutionality and purpose, which was explicated in the following terms:

"The several sections of Chapter 610, considered together, speak loudly and clearly for the General Assembly that its intent in enacting the Sunshine Law, so-called was that all meetings of members of public governmental bodies (except those described in § 610.025) at which the peoples' business is considered must be open to the people and not conducted in secrecy, and also that the records of the body and the votes of its members must be open." *Cohen, supra* at 52.

*Pulitzer v. McNeal, supra,* the most recent case on the subject, describes the tension between the general protection and specific exemption sections of the law in the language below:

"The very basic right of the public to be fully informed of government activities conflicts with the obvious necessity for restraints on this right to know in the case of litigation, meetings and records relating to personnel, mental health matters, military matters and juvenile and certain other court proceedings. The conflict here is one between the philosophy of openness in government, which for the

---

1. Chapter 610 was originally RSMo 1975. Some amendment, not here relevant, is contained in RSMo 1977.

last few years has been the subject of much discussion and legislation on both the federal and state levels, and the recognized need for confidentiality in certain special situations. The legislature recognized both the need for openness and the concomitant need for exempting certain types of information from disclosure when it passed the Sunshine Law in 1973. This conflict, coupled with the need to divine the legislative intent behind the Sunshine Law, presents a problem of some magnitude, and is further complicated by a lack of precedent in this developing field of law." *Pulitzer, supra* at 805.

Turning now to the specific issues presented in this case, the first issue is the interpretation of § 610.025 RSMo Supp.1975 in particular, the language creating an exemption from the legislative mandate of open meetings. Thus, at the heart of this case is the meaning of the words, "relating to the hiring, firing, or promotion," of personnel contained in the exemption section 610.025(4). The trial court found, and the defendant School District argues for a broad reading of this language; the plaintiffs argue for a narrow or "plain meaning" construction of the terms.

In its findings of law, the circuit court specifically found that:

"12. The word 'hiring' in Section 610.025(4) is not limited to the selection of a person for employment with a governmental body in the first instance, but would include any offer of employment by a public governmental body and the acceptance thereof by the employee.

13. The word 'firing' in Section 610.025(4) is not limited to permanent and involuntary termination of the employment relationship between employee and employer by the unilateral action of the employer, but would include any discharge from a position presently held even though the discharge is followed by an offer of employment for a different position.

14. The word 'promotion' in Section 610.025(4) is not limited to but it does include the granting of a better position with greater responsibility and/or better working conditions and/or increased remuneration."

On the basis of these definitions, the circuit court found the actions of the Board of Directors on April 6 and 7, 1976, "related to the hiring, firing or promotion of personnel and as such were properly the subject of the closed meeting under Section 610.025."

As to the first part of the trial court's conclusions of law set forth above, the definitions of the terms "hiring," "firing," and "promotion," are attacked by plaintiffs as overly broad. In support of the contention, they argue that the word "hiring" relates only to the original employment and that "reemployment" or "reappointment" are not within the meaning of the term. This argument is supported with references to statutes relating to the employment and tenure of teachers. Plaintiffs say that Section 168.126 RSMo 1969, requires school board action to employ a teacher in probationary status but "reemployment" may be by "inaction" of the board. This leads plaintiffs to the conclusion that since the two definitions of teacher status receive different treatment in terms of board action, they both cannot be comprehended within the "hiring" and "firing" language of the Sunshine Law. Similar arguments are offered as to the administrative personnel. The only authority cited is *Stoneman v. Tamworth School District,* 114 N.H. 371, 320 A.2d 657 (1974). That case does define "hiring" in terms of initial employment in answering one of the contentions of the defendant school board. The holding of the case, however, is that language of "dismissal, promotion, or compensation" comprehended the entire employment status and that the nonrenewal of a teaching contract amounts to a "dismissal" because the New Hampshire statutes (like Missouri's) provide for automatic renewal of employment, absent board action.

There is little authority in Missouri to aid in construing the terms in question. As noted in *Pulitzer Publishing Co.,* a survey of other Sunshine Law statutes in other states

is not helpful because the language of the various statutes varies so widely, and none closely tracks the language of the Missouri Sunshine Law.

"There is a thread of general intent running through this type of legislation, as adopted in other states, to exempt from disclosure matters relating to appointment, employment, discipline or dismissal of employees. In some states the employee being investigated is permitted to open to the public an otherwise closed meeting. Perusal of these statutes has only served to emphasize that the problem of closing personnel matters is recognized in nearly all jurisdictions which have passed open meetings legislation." *Pulitzer Publishing Co., supra* at 809.

Plaintiffs cite the undoubted rule of construction, " 'When called upon to construe a statute, the court's prime duty is to give effect to the legislative intent as expressed in the statute.' " *In Re Tompkins Estate,* 341 S.W.2d 866, 872 (Mo.1960). That duty, in this case, is not an easy one because the statute and legislative history are barren of any aids to construction of the terms "hiring, firing, or promotion" of personnel. An additional rubric of statutory construction applicable here is, "[t]he words used in the statute should be given their usual, plain and ordinary meaning so as to promote the object and manifest purpose of the statute." *State ex rel. State Highway Commission v. Wiggins,* 454 S.W.2d 899 (Mo. banc 1970); *State ex rel. Zool. Park of St. Louis v. Jordan,* 521 S.W.2d 369 (Mo.1975).

The purposes of the Sunshine Law have already been discussed. See *Cohen v. Poelker, supra,* and *Pulitzer Publishing Co., supra.* It is clear that the overall intent is to make meetings of public bodies which affect public matters open to the public. Defining a purpose for the exceptions to the general coverage of the statute is a more difficult task. Commentators and drafters of other states' Open Meeting Laws have repeatedly pointed out the need for confidentiality in some areas of public work. See Comment, "Open Meeting Statutes: The Press Fights for the Right to Know,"

75 Harv.L.Rev. 1199, 1208 (1961–62). Wickham, "Let the Sunshine In!" 68 N.W.L.Rev. 480, 485 (1973); Tacha, "The Kansas Open Meeting Act; Sunshine on the Sunflower State?" 25 Kans.L.Rev. 169, 194–195 (1977). Hollow and Ennis, "Tennessee Sunshine; The People's Business Goes Public," 42 Tenn.L.Rev. 527 (1974–75); 38 A.L.R.3d 1070 (1971).

The need for confidentiality in personnel matters is a well-recognized exception to the requirement for open meetings. Other state statutes have outlined the policy behind such an exception in statutory language. For example, note the language in the following state statutes which are representative selections of such policy statements:

84–1410. *Closed session; when; purpose; reasons listed; vote to hold closed session; recorded; right to challenge; procedure.*

(1) Any public body may hold a closed session by the affirmative vote of a majority of its voting members if a closed session is clearly necessary for the protection of the public interest or for the prevention of needless injury to the reputation of an individual and if such individual has not requested a public meeting. Nebraska Rev.Stat. (Supp.).

61.810. *Exceptions to open meetings.*

All meetings of a quorum of the members of any public agency at which any public business is discussed or at which any action is taken by such agency, are declared to be public meetings, open to the public at all times, except for the following:

. . . . .

(6) Discussions or hearings which might lead to the appointment, discipline or dismissal of an individual employee, member or student without restricting that employee's, member's or student's right to a public hearing if requested, provided that this exception is designed to protect the reputation of individual persons and shall not be interpreted to permit discussion of general personnel matters in secret. Kentucky Rev.Stat.Ann.Supp.1978.

Protection of an individual's reputation and privacy seems to be the primary consideration in the personnel exceptions in the statutes of other states. The Attorney General, in Opinion No. 144, adopted that view where the exact question was posed:

"Does the general discussion of personnel as a group, rather than as an individual or specific individuals, when determining budgetary increases or decreases that affect the size of the staff of said governmental bodies, give cause for the exclusion of the public at such meetings under the language, 'meetings relating to hiring, firing, or promotion of personnel?' "

The Attorney General's opinion asserts that "meetings of . . . governmental bodies for the purpose of discussing budgetary matters affecting personnel as a group, rather than on an individual level, are not authorized to be closed and must, therefore, be open to the public." Op. No. 144 *supra.* This opinion of the Attorney General of Missouri implicitly recognizes that the personnel exemption of the statute is based upon protection of the privacy of the employee.

Only one other possible legislative purpose for the enactment of the exemption statute suggests itself. The exemption of the statute may have been designed to permit free and open discussion by board members in personnel matters.

Considering these legislative purposes and the language of § 610.025 RSMo Supp.1975, the conclusion is compelled that the trial court definition of the terms of the statute was sound. The legislature could not have intended that the firing of a teacher was entitled to an exemption from the requirement of an open meeting and at the same time have required an open meeting when the teacher because of a probationary status failed to receive a renewal of contract, which amounts to a discharge. This would be so whether the legislative intent was to protect the privacy interest of the teacher or to foster free and open discussion by the Board. Whichever underlying purpose was intended, it can only be served if the entire employment relationship is within the exemption.

The second and more substantive argument advanced by plaintiffs to attack the trial court determination centers upon the following conclusions of law:

"13. Certain financial information *relating* to the projected financial deficit was presented to the Board at the April 4, 1976 session. Only matters relating to the hiring, firing and promotion of personnel were decided upon at the April 6 and 7 sessions. No matters of public policy were formulated at any of the sessions other than as *related* to hiring, firing or promotion of personnel. (Emphasis supplied).

. . . . .

17. The action taken at the sessions of the defendant's Board of Directors on April 6 and 7, 1976, *related* to the hiring, firing or promotion of personnel and as such were properly the subject of the closed meeting under section 610.025. The presentation of certain financial information during the April 4, 1976 session was in violation of the 'Sunshine Act' but no action was taken thereon and the presentation of such information does not void the personnel actions of the Board on April 6–7, 1976 which were properly the subject of the closed meetings under the 'Sunshine Act.' " (Emphasis supplied).

Plaintiffs argue that the trial court was in error in bifurcating the three-day session into *two* meetings. They assert it was in error in fact and in law. As will be seen, this question of the number of meetings is not critical. What is of critical importance is the trial court's broad definition of the word "relating," the prefatory word in the exemption of § 610.025(4) RSMo Supp.1975.

Although not directly centering upon the word, "relating," as it appears in the statute, the quarrel of the plaintiffs with this portion of the trial court's conclusions of law is based upon the general proposition that the decisions made at the meeting or meetings of the school board were primarily policy determinations. There can be no dis-

pute that there were decisions of public policy and budgetary matters made as a necessary preliminary to the determination of the related personnel matters. It is clear from the issues drawn in this case that the words "relating to hiring, firing or promotion" of personnel could be construed either in the very broad sense, which the school district advocates, or in the narrower sense which the plaintiffs advocate. The parties concede, and it is almost common knowledge, that a very high percentage of the entire budget of a school district is personnel expense. It follows, therefore, that almost any policy decision in a school district which involves a reduction or increase in the expenditures of the district will result in personnel reductions or increases. This is particularly true in the circumstances like those presented by the facts of this case, where the reduction of the budget is so large in comparison to the total budget that it could not be accomplished without some reduction in personnel. Thus, the discussions of the board with respect to the necessary reductions to be made in the budget and the changes in program were "related" to the hiring, firing, and promotion of personnel in the broad sense of that term. But, as the plaintiffs forcefully argue, the adoption of such a broad notion of "relationship" between the subject matter of a meeting and personnel would, in effect, subvert the entire purpose of the statute and permit almost any discussion of school board policy on the grounds that it related to matters of personnel. This raises again the "conflict" referred to in *Pulitzer, supra,* between the broad purpose of the Sunshine Law and the exemption.

To resolve this dispute with respect to the meaning of the term "relating" to personnel matters, and in accordance with the previously noted and well-established principles of statutory construction, the purpose or purposes of the statute are to be utilized in determining the meaning of the term. In this context, the rules of construction require that the major and underlying purpose of requiring open meetings be reconciled, if possible, with the legislative purpose of the personnel exemption of Section 610.025.

So considered, the trial court's broad interpretation of "related" seems in error, for the effect of that meaning attributed to the connection between specific personnel questions and underlying program or policy changes would seriously interfere with the overall legislative intent to require open meetings.

In the context of the factual situation in this case, there was certainly no reason apparent from the testimony, nor any advanced by the parties in argument, why the school board could not have discussed the issues of reduction and elimination of programs and reorganization of administrative staff in an open meeting, without reference to any matter which would have required the protection of the exemption concerning personnel matters.

The difficulty in the case, recognized by the trial court and still apparent on this appeal, is the characterization of the actions taken by the Board. In actual fact, when the decisions were made as to the furloughing of the probationary teachers and the demotion of the administrative personnel, there was little, if any, focus on individuals. The acting superintendent testified that the lists of teachers to be furloughed were prepared by the staff. Considerations in the preparation of the lists were the area of certification and the length of service. There was no selective determination by the Board as to which of the probationary teachers were to be furloughed. Several hundred other probationary teachers were retained by board inaction. As to the demotion of the 19 administrative employees, the acting superintendent testified that his direction from the Board was to eliminate the position of Director. So far as can be ascertained from this record, the 19 individuals reassigned as a consequence of the elimination of the position of Directors were all of the persons in that category. There was no selection of any kind on the basis of individual capability. The Board argues that there were options open to the Board to make different decisions with respect to the manner of making the program

reductions, and the presence of these options made it necessary to have a closed meeting for the purpose of permitting free and open discussion of the options. Nothing that has been said impinges on that right. Once the policy decision has been made in a public meeting to eliminate a program or positions, the Board can then meet and decide the specific personnel questions arising by reason of the budgetary or policy questions which have been properly determined in public view. All of the various options with respect to the specific individuals to be affected can then be discussed in a closed meeting. The Board's argument that the meetings needed to be closed to permit the discussion of the methods of termination and the individuals to be terminated does not support the closing of the meetings for the determination of the broad policy issues which necessarily preceded the discussion of the personnel problems. It is also argued that the meetings should be secret in order to avoid "stirring up" the teachers. That argument has validity when applied to the 465 teachers who were, in fact, furloughed. The argument's validity is lessened when it is recognized that the Board could and should have decided the policy questions in relation to programs in a public meeting. As Dr. Fields noted in his testimony, you cannot eliminate people without affecting programs, but it is also true that you can eliminate programs without determining which of several hundred people will be released. Nor is the Board's reliance on the formal agenda and the specific resolutions adopted persuasive. As the Board argues, the agenda and resolutions all refer to various personnel actions, but it is demonstrable on this record that the persons affected were only the persons in the programs eliminated, and the designation of the actions taken as personnel actions was but a facade to conceal the real and necessary determination to eliminate programs. It must be concluded that the actions taken at all three sessions were not solely with respect to individual personnel problems, but were policy decisions with respect to programs and administration which should have been decided in an open meeting. Such a holding makes unnecessary any determination as to whether there were one or two meetings. A public meeting, within the meaning of the statute, is any meeting at which "public business is discussed, decided or public policy formulated." Thus, content and not formal agendas or self-serving characterizations of the business conducted or discussed must control. It should be too clear for comment that the inclusion in a "meeting" of some single "personnel action" cannot insulate the balance of the meeting from the requirement of public disclosure. This is particularly true when it is recognized that the statutory definition of a "public meeting" contained in § 610.010 RSMo 1975 is based on the substance of what occurs and not on the formal designation as a meeting. This definition would permit a portion of a "meeting" devoted to matters within the exempt category to be closed.

However, the effect of holding that the trial court was in error in categorizing the April 6th and 7th meeting as one relating to personnel actions does pose the difficult issue of the propriety of the trial court judgment denying relief.

The parties have briefed and argued the issue on the assumption that two questions exist in this case which must be decided. These questions as posed by the parties are, first, is the remedy by injunction, specifically stated in the statute to be the relief afforded for a violation of the Sunshine Law, the exclusive remedy? Second, if the injunction is not the exclusive relief to be afforded, should the court declare actions taken in violation of the Sunshine Law void or voidable? Missouri has not decided the issue of whether the injunctive relief afforded in specific terms by the statute is exclusive. Nor has the issue of voidness or voidability of such actions been decided. Two cases have been found in which the issue of voidness or voidability has been mentioned; but in each of them, the court determined the issue need not be reached or decided. In *State ex rel. Philipp Transit v. Public Service Commission,* 552 S.W.2d 696 (Mo. banc 1977), the case turned on a hold-

ing that notational voting by the Commission was not authorized, and the court declined to consider the voidness issue. In *State ex rel. Churchill Truck Lines v. Public Service Commission*, 555 S.W.2d 328 (Mo. App.1977), the court turned aside the voidness issue upon the procedural ground that the issue had not been raised in the motion for rehearing before the Commission and, not being jurisdictional or plain error, did not require resolution.

Because of this paucity of authority in Missouri, the parties have extensively briefed and argued cases from foreign jurisdictions involving the question of voidness or voidability as a remedy and have likewise briefed and argued extensively the question of the exclusiveness of a statutory remedy. That briefing is of little benefit in the determination to be made in this case considering, as this court must, the procedural posture in which the question is presented. As is frequently the case, the issue has been presented by the briefs in much too abstract a fashion, both parties apparently desiring some determination of the principle without devoting much attention to the procedural posture of the case and the necessity for a judicial determination of the issue presented.

There can be no question that the plaintiffs' pleading in both cases and in both counts requests injunctive relief. Count I of both petitions, in addition to the temporary injunction, no longer an issue in this case, requested a continuing injunction against future meetings in violation of the Sunshine Law. Count II in both petitions re-pleads the allegations of Count I and requests affirmative relief in terms of a mandatory injunction directing the school district to undo the actions taken at the disputed meetings and thereby to return the plaintiff teachers to their positions as probationary teachers, and the directors to their positions as they existed prior to the meetings. The monetary relief requested is only incidental to that prayer for mandatory injunction in both petitions.

The real issue to be met and decided, in the context of these pleadings and the trial court judgment, is the nature and extent of injunctive relief available under the Sunshine Law and whether the trial court properly or improperly decided the question of the denial of injunctive relief. That injunctive relief by way of mandatory injunction might have the effect of voiding the actions taken by the school board cannot be denied, but that is always true when a mandatory injunction is issued requiring the undoing of a completed act.

Before undertaking a determination of the soundness of the trial court's denial of relief in this case, certain basic principles should be noted.

■ When the Legislature enacts a statute referring to terms which have had other judicial or legislative meaning attached to them, the Legislature is presumed to have acted with knowledge of that judicial or legislative action. *McKenzie v. Missouri Stables*, 225 Mo.App. 64, 34 S.W.2d 136 (1931); *Plater v. W. C. Mullins Const. Co.*, 223 Mo.App. 650, 17 S.W.2d 658 (1929); *State ex rel. Danforth v. Milan C–11 School District*, 446 S.W.2d 768 (Mo.1969). Thus, when the Legislature adopted § 610.030 RSMo Supp.1975 and provided that the circuit courts should have jurisdiction to issue injunctions to enforce the provisions of Chapter 610 RSMo Supp.1975, it must be conceded that they did so with full knowledge of the provisions of Chapter 526 RSMo 1969 and the extensive judicial interpretation affecting injunctive relief.

In the determination of the judicial soundness of the trial court's refusal of injunctive relief, the principles of Missouri law defining and limiting the use of injunctive relief must be considered.

■ As a general proposition, injunctive relief is discretionary and does not issue as a matter of right. " '[I]ts granting rests in the sound discretion of the court, to be exercised in accordance with well settled equitable principles and in the light of all the facts and circumstances in the case.' " *State ex rel. Ellis v. Creech*, 259 S.W.2d 372 (Mo. banc 1953) at 374. See also *State ex rel. Danforth v. W. E. Const. Co.*, 552 S.W.2d 72 (Mo.App.1977).

Certain other principles have been enunciated with respect to various types of injunctive relief. When the injunctive relief is sought to restrain future threatened action, the threatened action must be based upon a real apprehension that the acts for which the injunction are sought are not only threatened but will in all probability be committed. Unless it can be shown that reasonable grounds exist for apprehending that absent the injunction the actions will be done, the injunction will be denied. *Eckhardt v. Bock,* 159 S.W.2d 395 (Mo.App.1942); *St. Louis 221 Club v. Melbourne Hotel Corp.,* 227 S.W.2d 764 (Mo. App.1950). It is also a principle of the equity jurisprudence surrounding the use of injunctive relief that the court will not issue an injunction when the order of the court to be embodied in an injunction is impossible of performance. *Hribernik v. Reorganized School District R–3,* 276 S.W.2d 596 (Mo.App.1955).

Relief by way of mandatory injunction is given with more caution than other types of injunctive relief. The Missouri cases follow the general rule found in 42 Am.Jur.2d § 20.

"In this connection, it must be borne in mind that a mandatory injunction directing the undoing of that which has been done may not be granted on doubtful proof; the mandatory injunction is a harsh remedy, to be granted only when the right thereto is clearly established, the burden of proof being upon the complainant." *Minton v. Steakley,* 466 S.W.2d 441, 443 (Mo.App.1971); *Cook v. Rupp,* 565 S.W.2d 833, 837 (Mo.App.1978).

In cases where there is a substantial public interest involved, as in the instant case, there are other considerations that the trial court takes into account in exercising its discretionary powers. These considerations are set out in *Higday v. Nickolaus,* 469 S.W. 859 (Mo.App.1971), a case involving a contest between private landowners and the City of Columbia over the rights to percolating water. *Higday* cites and summarizes a line of Missouri cases involving injunctive relief and various public interests.

*Higday* cites *Smith v. City of Sedalia,* 244 Mo. 107, 149 S.W. 597, 601 (Mo.1912) for the proposition that:

" 'The writ of injunction is an extraordinary remedy. It does not issue as a matter of course, but somewhat at the discretion of the chancellor. It is his duty to consider its effect upon all parties in interest, and to issue it only in case it is necessary to protect a substantial right, *and even then not against great public interest.*' " *Higday, supra* at 871.

See also *Johnson v. Independent School Dist. No. 1,* 239 Mo.App. 749, 199 S.W.2d 421, 424 (1947); 43 C.J.S. *Injunctions* § 37.

In the *Smith* case, the court balanced the competing interests of a landowner and a city in a case involving water pollution—the city was held to have the paramount interest, and the injunction was denied. In the *Johnson* case, a septic tank owned by the school district which overflowed onto plaintiff's land, was held to be a sufficient public health interest to deny the injunction, even though the plaintiff had no adequate remedy at law.

*Higday, supra,* continues the summary of cases involving the weighing of public and private interests by citing *Rubinstein v. City of Salem,* 210 S.W.2d 382, 386 (Mo.App. 1948), and *Barber v. School District No. 51, Clay County,* 335 S.W.2d 527, 530 (Mo.App. 1960). In *Rubinstein,* the court balanced the rights of an individual businessman who constructed a sidewalk in good faith, relying on the oral approval of the City Council, and the rights of the City Council to require written building permits. In upholding the business' permanent injunction, the court made the necessary weighing of inconvenience and need.

The *Barber* school district case is factually similar to the *Johnson* case cited earlier, and holds that the school district's need for the septic tank was greater than the damage done to the individual plaintiff's land. The rule announced in *Barber, supra* at 530, and repeated in *Higday, supra* at 871, drawn from 43 C.J.S. *Injunctions* § 37, p. 849, is as follows:

"[W]hen the issuance of an injunction will cause serious public inconvenience or loss,

without a correspondingly great advantage to plaintiff, no injunction will be granted, . . . ."

See also 42 Am.Jur.2d § 56, pp. 798–800.

■ In the extreme case, where the balance is definitely weighted toward the public interest, the grant of injunctive relief may even be "unconscionable." *Higday, supra* at 871, and *Horine v. People's Sewer Co.*, 200 Mo.App. 233, 204 S.W. 735, 736 (1918).

■ The first issue is the denial of relief under Count I of the petition. As has been previously noted, the only remaining claim for relief at trial was the request for a continuing injunction. At the time of trial, a request for an injunction against the implementation of the actions adopted at the disputed meetings was a pleaded issue, but the issue concerning that relief is now moot since all of the actions have been fully implemented by the School District and were so implemented at the time of the circuit court hearing. *Hribernik, supra* at 597–98.

■ On the issue of a continuing injunction to restrain future violations of the Sunshine Law, there was no proof of any sort in the hearing before the trial court that the school board contemplated, planned, or even threatened to conduct any future meetings in a manner violative of the Sunshine Law. In fact, it is apparent from the record that the school district was attempting to comply with what its understanding was of the restrictions of Chapter 610 and, in the absence of authoritative judicial interpretation of the provisions of the statute, they failed to properly observe its mandate. In this respect, the instant case is very much like *St. Louis 221 Club, supra*, in which there was a dispute between the parties with respect to the meaning of the lease contract, and the court held that a continuing injunction was not necessary since there was no reason to believe that once the contract issue had been settled, the defendants would not comply with its terms. Here, too, there is no evidence and certainly no implication that the school board will not conduct future meetings in accordance with the statute as here construed.

■ The second count of both petitions seeks mandatory relief. Plaintiffs requested the trial court to command the school district to take such action as would be necessary to return the situation to its status quo prior to the contested meetings. In determining the rightness of the trial court's denial of that particular form of relief, this court will weigh, as the trial court properly could have, the nature of the right sought to be enforced and the public interest that would be affected by the issuance of an injunction to protect that right.

■ In this connection, it is well to advert to the plaintiffs' interest and claim of right. These were class actions brought by a class of teachers and a class of administrators adversely affected by the actions of the board. There is no claim on the part of either set of plaintiffs that they were representing any portion the public as members of their class. Nor did the evidence produced in support of the composition and validity of representation of the class indicate any claim on the part of these plaintiffs that they sought to protect the patrons of the Kansas City School District or their children from violations of the Sunshine Law. In fact, the named plaintiff Bates lives in Johnson County, Kansas, and named plaintiff Hudson lives in Platte County.

Unnecessary for decision in this case but implicit in the circumstances is the question of whether or not these plaintiffs could even assert rights under Chapter 610. That issue with respect to the granting of injunctive relief was discussed in *Eyerman v. Mercantile Trust Company*, N.A., 524 S.W.2d 210 (Mo.App.1975), where the court quoted from a federal case, *Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974). That case applied a dual test to determine first, if the challenged action would cause the plaintiffs injury in fact, and second, if the injury was within the "zone of interests" created by statutes which

plaintiffs contend are being violated. The *Eyerman* court noted that the rule suggested a need for a causal relationship between the action challenged and the injury complained of. It may well be that there is no causal relation in this case between the violation of the Sunshine Law and the plaintiffs' injury, the loss of their positions and their demotions. Those acts are not caused by the violation of the Sunshine Law; they are caused by the actions of the board. Those actions were completely lawful in terms of the statutes governing the dismissal of probationary teachers and demotion of administrative personnel. Although it is not necessary to determine or decide the "standing" question, it is apparent that the plaintiffs do not seek to enforce a clearly established and substantial right.

On the other hand, the granting of a mandatory injunction in this case would clearly be against great public interest. The actions of the school board taken in these contested meetings constituted a massive reorganization of the programs and personnel of a large metropolitan school district. As far as can be ascertained, they have been completely and totally implemented. To require their undoing by means of a mandatory injunction would create administrative and fiscal chaos within the school district. Compared to the public interest noted in *Higday, supra,* and *Smith,* and *Johnson, supra,* the public interest here which would be adversely affected by the issuance of mandatory injunctive relief is clearly much greater.

If error be found in the review of a court-tried case under Rule 73.01, the obligation of this court is to further determine if the error substantially affects the rights of the parties. *Fowler v. S–H–S Motor Sales Corp.,* 560 S.W.2d 350 (Mo.App.1977). The trial court was in error in its conclusions of law concerning the application of Chapter 610 RSMo Supp.1975 to the disputed meetings, but the trial court's denial of the injunctive relief sought was, in the circumstances, a proper judgment so that no error affecting the rights of the plaintiffs has occurred. Judgment of the circuit court is affirmed.

All concur.